## IN THE

# SUPREME COURT

### OF THE

## STATE OF WISCONSIN.

17  1
93  459

### MABIE and another vs. MATTESON and another.

Under a license to sell certain land of his decedent, described by metes and bounds, "together with all the appurtenances, mills and mill privileges, and rights and interests of what kind or nature soever," an administrator or executor cannot bind the estate by a covenant for the quiet enjoyment by the purchaser of an easement in other lands of the decedent, unless such easement has already become, in law, appurtenant to the land sold.

The owners of an upper mill have the right, at the common law, as against the owner of a lower mill, to shut their gate and keep back the water, when necessary to the reasonable and beneficial use of their mill, due regard being had to all the attendant circumstances.

The acquisition by the lower mill owner, in such a case, of a right to have the water flow uninterruptedly through the gate on the upper mill premises, is the creation of an easement upon those premises.

Such easement, once created, becomes *appurtenant* to the dominant estate, a conveyance of which carries with it the easement, whether mentioned in the deed or not.

An easement in one parcel of land cannot be created in favor of another, while both parcels are owned in fee simple by the same person.

Where A, owning land in common with others, has covenanted with another party for the quiet enjoyment by the latter of an easement in the land, the estoppel thus created as against A, is liable to be defeated by his co-tenants, and will remain inoperative so long as it cannot be enforced against him without injury to their interest, or that of their grantees.

VOL. XVII—1

By acquiring A's interest in the land (although it may form a very large proportion of the whole estate), his co-tenants will not subject themselves or their grantee to such estoppel.

APPEAL from the Circuit Court for *Walworth* County.

Action by the owners of a grist mill against the owners of a saw mill situated above the former upon the same stream, and adjoining a dam at the outlet of Delavan lake into said stream, for damages caused by obstructing the water of said stream, and for a perpetual injunction. The complaint alleges that the plaintiffs are entitled to have the water flow through the gate of said saw mill when the same is not running, the same as though it were running, and that the defendants have obstructed such flow. The answer denies the alleged right.

The cause was tried by a referee, who reported the following facts : That during and prior to the year 1840, both mills, and the lands upon which the same are situate, were owned jointly by Samuel Phœnix and Henry Phœnix, by whom the mills, dams, raceways, &c., were constructed ; that they erected the dam at the outlet of said lake so as to raise the lake four or five feet, "for the express purpose of gathering and saving the water at times when there were freshets, and thereby creating and filling a reservoir for the use and benefit of the grist mill in times of scarcity of water ;" that "not only was such the declared object of the original proprietors, but they so treated and used said lake and water at said mill until their decease, and it was even after their death so treated and used by their legal representatives and their heirs ; that said Samuel Phœnix died intestate, September 7th, 1840, leaving Sarah A. Phœnix his widow, and one child, Franklin K. Phœnix, sole heir to his estate ; that said Sarah and Wm. A. Bartlett were duly appointed and qualified as administrators of said estate ; that Henry Phœnix died in February, 1842, leaving a will by which Ann Phœnix, his widow, and Wm. A. Bartlett were appointed his executor and executrix, who, duly qualified,

&c.; that said executor and executrix were authorized by said will to sell the real estate of their testator for the purpose of rais- ing money to pay the debts of the estate ; that said legal rep- resentatives of Samuel and Henry Phœnix were licensed by an order of the county court to make sale of the real estate of their decedents described in said order, being the grist mill and land upon which the same is situate, described in the com- plaint in this action as the property of the plaintiffs ; that, in pursuance of said power and license, they, in 1843, sold the premises to one Croswell, and executed to him a warranty deed, with the usual covenants and also the following: first, "to secure forever to [the grantee], his heirs and assigns, the privilege of having the water run through the saw mill gate at the outlet of Delavan lake, at all times, whenever the said mill is not running, the same as though it was running." 2. " To keep a good and permanent dam across the said outlet * * above the saw mill, commonly called the saw mill dam, and keep the same at the height it was on &c., for the term of ten years from the 1st of August, 1843, * * *." 3. That the grantee "shall have all the privileges of the use of the water of the outlet of said lake, at the grist mill * * * and shall receive no hindrance from any other machinery being built between the grist mill and the lake," &c. The referee further found that Croswell had conveyed all his rights in the premises to the plaintiffs ; that the deeds of conveyance were duly recorded long prior to any claim by the defendants to the saw mill premises; that the money paid by Croswell for the grist mill premises was duly applied by the representatives of Samuel and Henry Phœnix in payment of the debts of said estates ; and that Franklin K. Phœnix, sole heir to the estate of Samuel Phœnix, arrived at the age of twenty-one about the year 1846, and had so far acquiesced in and approved of the administration and settlement of his father's estate. The ref. eree further reported " that the erection and maintenance of said dam is appurtenant to and for the use of said grist mill,

prior to any benefit to be derived therefrom for any other mill or machinery, and the right to control as well as the expense of maintaining [said dam] belongs to the owners of said grist mill, subject only to the secondary rights of said saw mill and the owners and proprietors thereof; that the plaintiffs are entitled at all times to a free use of all the water flowing from said reservoir through the open gates of said saw mill, to the same extent as if the said saw mill were continually running, and as though no other machinery were situated between the grist mill and said lake; that the defendants have been in the habit of shutting off the water from the plaintiffs' mill, as charged in the complaint, for the purpose of getting a head in the pond or reservoir above, and then running said saw mill until the head is again reduced, &c., greatly to the injury of the plaintiffs; and that the defendants threaten to continue such obstruction of the water. The referee, therefore, found that the plaintiffs were entitled to judgment for damages, and to an injunction as demanded in the complaint. The report of the referee was confirmed, and judgment rendered by the court in accordance therewith; and exceptions were filed, and this appeal taken by the defendants.

It appears from the stipulations and exhibits attached to the referee's report, that at some time prior to 1853, and subsequent to 1843, Franklin K. Phœnix, sole heir of Samuel, conveyed one undivided half of the saw mill premises to Ann Phœnix, widow of Henry, by warranty deed, without mention of any easement or servitude such as the plaintiffs in this action claim; and that Ann Phœnix, by a similar deed, conveyed the same, together with an interest equal to three-eighteenths before owned by her in the same premises, to William H. Phœnix, one of the six children of Henry; that three others of said heirs of Henry conveyed their respective interest to some one, but the record does not show to whom; that William H., in 1855, conveyed the premises by warranty deed, without reservation of any easement or servitude, to one

Thomas; and that Thomas, in 1860, entered into a written contract for the sale of said premises to the defendants, also without any reservation, and had given them possession.

The license of the county court under which the representatives of Samuel and Henry Phœnix sold and conveyed the grist mill premises to Croswell, empowered them to sell said premises (described in the order by metes and bounds,) "together with all the appurtenances, mills and mill privileges, and rights and interests of what kind or nature soever."

*Spooner & Kellam*, for appellants:

1. The executors of Henry Phœnix had no authority, under his will, to make the covenants under which the plaintiffs claim as assignees. They were authorized, in certain contingencies, to sell real estate, but this gave them no authority to charge or encumber any property besides that which they sold. A devise that an executor may sell lands, is a naked power, and confers no authority to mortgage, charge or encumber. 1 Sugden on Powers, 538; 1 Hill, 111; 3 id., 361; 1 Sandf. Ch., 17; 3 Barb., 128; 4 Coms., 9. 2. The license of the probate court, under which the executors and administrators assumed to act in their conveyance to Croswell, conferred no authority to make the covenants in question. 3. If there existed ample authority to make them, those covenants *convey* nothing. They are simply stipulations or agreements, upon breach of which an action will lie for damages, but not an action for the possession of an estate granted. Bl. Comm., Book 2d., 245; Greenl. Cruise, Book 2d., Titles 32, 35; 21 Pick., 417. 4. Croswell took by his deed the lower mill power and whatever was at that time appurtenant thereto, and the plaintiffs, as his assignees, can claim nothing more. There is no sufficient evidence that any part of the upper mill power was at that time appurtenant to the lower. The only evidence is that which arises from the manner in which both powers were used by the Phœnixes while they owned them jointly, and the declaration of Samuel and Henry Phœnix, when they were building the

upper dam, as to its purpose. These, however, establish nothing, because while the same parties owned both mills, such use was not adverse. *Cary vs. Daniels*, 8 Met., 466, 482–3; 14 Mass., 49. It appears also that neither party to the deed to Croswell considered the right to control the gates of the upper mill as appurtenant to the lower, and hence they sought to convey it by special covenants. The distinction between what is *necessary* to the enjoyment of a thing and what is simply *convenient* or *desirable*, is well settled and important. Angell on Water Courses, p. 203; *Howell vs. McCoy*, 3 Rawle, 256.

*Henry F. Smith*, for respondents:

The right at all times to use the water of the reservoir created by the saw mill dam, for operating the grist mill, by keeping the saw mill gate always open, was an *appurtenance* to the grist mill, and passed to Croswell by the deed to him; because at the time of that conveyance, and for a long time previous, such right was in actual use for, and really annexed to the grist mill. 4 Kent's Comm., 467; Angell on Water Courses, pp. 185–6, § 153; *Oakley vs. Stanley*, 5 Wend., 523; *Le Roy vs. Platt*, 4 Paige, 77; *Burr vs. Mills*, 21 Wend., 290; 2 U. S. Digest, 57, § 759; 1 Sumner, 462; *Allen vs. Scott*, 21 Pick., 25; *Goodrich vs. Jones*, 2 Hill, 142; *Irwin vs. U. S.*, 21 Curtis, 281, and 16 How., 513. For seventeen years or more the grant to Croswell was always treated by the parties interested as embracing all the privilege[*] now claimed. That construction of the grant is now conclusive. 21 Curtis, 281; 16 How., 513. It is manifest that Croswell intended to purchase, and the executors and administrators intended to sell, the privilege claimed. Such use of the water was as much a part of the consideration for the $500 paid by Croswell, as was the land or the grist mill itself. He fully paid the sum agreed upon, the money was appropriated by the joint estate, and the heirs have ever since acquiesced. Croswell's grantors could not question his right to use the water to the same extent as it was in use for the grist mill at the time of the conveyance to him.

And their subsequent grantees of the saw mill would be equally bound by the grant to Croswell.

*A. H. Barnes*, on the same side, contended that the testimony showed that the grist mill could not be operated during a large portion of the year without an uninterrupted passage of water from the reservoir to it, and that the right to have the water so pass was appurtenant to the mill, because indispensably necessary to its use, and always acknowledged and acquiesced in by the parties owning or occupying the saw mill, until denied by the defendants a short time before the institution of this suit. 2. If the plaintiffs have not the right to have the water run through the saw mill gate, it amounts simply to this : the defendants, being at the outlet of the lake, may control the water as they please; and the plaintiffs' mill would be just as valuable miles away from the stream as where it is now standing.

*By the Court*, DIXON, C. J. Understanding that the grist mill power is distinct from that of the saw mill—that it is some miles below and created by a separate dam and reservoir, (facts upon which, by the neglect of counsel, the printed case is not so clear and specific as it should have been,) I fully agree that the representatives of the two Phœnixes deceased—the executor and executrix of the will of Henry, and the administrator and administratrix of the estate of Samuel, had no power, under the license of the probate court, to convey to Croswell, his heirs and assigns, " the privilege of having the water run through the saw mill gate at all times whenever the saw mill is not running, the same as though it was running ;" nor to covenant that he and they should perpetually enjoy such privilege. The license was to sell the grist mill property, described by metes and bounds, to satisfy the joint debts of Henry and Samuel. No mention was made of the saw mill property, nor leave given to incumber it in any manner whatever. For all that appears or was expressed in the order, it was to re-

main to the free and unimpaired use of the heirs and devisees. If therefore the representatives had any such authority, it must be upon the ground taken by plaintiffs' counsel, that the special " privilege " was an appurtenance to the grist mill, and as such would necessarily have passed to Croswell by the conveyance, though not expressly named. In support of this position the counsel relies upon what he claims, and what may be admitted, to have been the intention of the Phœnixes at the time of building the dams, that the one at the saw mill should be used as a sort of reserved force or feeder to aid in operating the grist mill, and that the erection of the saw mill was incidental to this main purpose, the design being to employ the surplus power thus created, but in no way to interfere with the utmost possible advantage of water to the grist mill. He furthermore proceeds upon the subsequent practice of the Phœnixes and their representatives, in conformity to such original intention, which was continued up to the time of the sale to Croswell, and even after, but not so long as to constitute the foundation of a right by prescription. I cannot agree with the counsel in this position. The right of the owners of the grist mill thus to control the use and flow of the waters at the saw mill, would, if it existed, be an ' easement—one of that negative kind described by Professor WASHBURN, "where the owner of the servient estate is prohibited from doing something otherwise lawful on his estate, because it will affect the dominant estate." 2 Washb. on Real Prop., 26. Without this privilege on the part of the proprietors of the grist mill, it is one of the common law rights of the owners of the saw mill to shut their gate and keep back the water when necessary to the reasonable and beneficial use of their mill, due regard being had to all the attendant circumstances. Angell on Watercourses, §§ 116 to 120; *Platt vs. Johnson*, 15 Johns., 213; *Cary vs. Daniels*, 8 Met., 466; *Pitts vs. Lancaster Mills*, 13 id., 156. The interruption of this common law right and vesting t in the proprietors of the grist mill, or annexing it to their

estate, is, in every proper sense, the creation of an easement.
2 Washb. on R. P., 25, 26.   Once created, such easement be-
comes appurtenant to the dominant estate, a conveyance of
which carries with it the easement, whether mentioned in the
deed or not.   Id., 28, 623.   "But in order to pass as appurte-
nant, there must, as a general proposition, be an *existing ease-
ment*, in the technical sense of the word, meaning thereby a
right to use *another's* land for special and temporary purposes,
in connection with the land for the use and enjoyment of which
the right is exercised."   Id., 623.

I take it to be clear, and understand counsel to admit, that
the privilege claimed is not an *appurtenance* within the strict
and ordinary legal definition of the word; that is, that it is
not *necessary* in order to the enjoyment of the saw mill proper-
ty, "that without which the grant itself would be of no effect."
Broons' Legal Maxims, 362.   It may be *convenient*, but it is
not *necessary*.   Without it the proprietors have all the rights
incident to such an estate, and are subject to the inconvenien-
iences, among which may be reckoned that of having the wa-
ter occasionally retarded for the benefit of the owners of the
upper mill.

The question, therefore, whether the privilege passed as
appurtenant, or whether the representatives were authorized
to convey, depends upon whether it was an existing easement;
and this again turns upon the inquiry, whether there can be an
easement in favor of one estate against another, where both
belong to the same owners.   I think it very clear, whatever
may be the usage and practice of the owners, that there can-
not.   Upon this subject Professor WASHBURN (p. 26) says:
"The definition given above implies that for an easement to
exist there must be two estates in regard to which it is predi-
cated, and that it is not affected by any change of ownership
of the respective estates, except that they must belong to dif-
ferent persons; for no man can, technically, be said to have
an easement in his own land.   And the consequence is, that if

the same person becomes owner in fee simple of both estates, the easement is extinguished." Beside the authorities cited to the text, the principle, which is elementary, is fully sustained by the cases referred to by the counsel for the appellants. *Gayetty vs. Bethune*, 14 Mass., 49, and *Cary vs. Daniels*, 8 Met. 466. The last named case is directly in point. The proprietor of an upper mill claimed the right, founded on the usage and practice of his grantors when they were the owners of both, to open the waste gates of the dam at the mill below, in order to relieve his own mill from back water. The court, by SHAW, C. J., said: "The court are of opinion that this claim cannot be sustained. At the time of the practice relied on the grantors were owners of both mills, and might favor the one at the expense of the other as the exigencies of their business might require, or at their own mere pleasure. But no right could be founded upon such practice, because it was not adverse. When the estates were severed, and the rights of the respective proprietors became adverse, they stood upon the same footing as if no such usage had existed."

The language of the license was, "together with all the appurtenances, mills and mill privileges, rights and interests of what kind or nature soever." It is contended that the words "rights and interests" conferred the power to grant the privilege in question. But this is clearly not so. Those words must be construed with reference to the estate to be granted, and mean all rights and interests pertaining thereto, and not to some other estate not included in the order. Otherwise the representatives might, under the same order, have sold all the lands of which the two Phœnixes died seized, or any right or interest in them which they conceived might be *convenient* to the purchasers of the grist mill, which would be absurd.

It is also contended that as twelve eighteenths of the title under which the defendants claim are derived through Ann Phœnix, one of the grantors in the deed to Croswell, they are estopped by the covenants of that deed from asserting that

Croswell did not acquire the privileges which the grantors undertook to give. It may be admitted, as indeed there is little room for doubt, that Ann Phœnix bound herself personally by the covenants to Croswell, and that she would be estopped; but the counsel for the plaintiffs answers his own argument when he says there cannot be an estoppel by fractions, or, to use his language, there can be no such thing as *twelve thirteenths* of an estoppel. It does not appear that the defendants are interested in the whole of the saw mill property. Thirteen eighteenths are shown to be in one Thomas, from whom the defendants have a contract of sale. Of these, one eighteenth comes from William H. Phœnix, who acquired the title under the will of his father, Henry. Of the twelve eighteenths which came through Ann, the widow of Henry and mother of William H., she took three by the will of her late husband, and acquired nine by purchase from Franklin K. Phœnix, sole heir of Samuel. Ann conveyed to William H., who conveyed to Thomas. Of the other five eighteenths which belonged to the estate of Henry, three appear to have been conveyed by the devisees under his will, but to whom the record does not disclose. Two eighteenths still remain in the devisees. It is obvious from this statement that the estate of William H., as also that of the other devisees under the will, except the widow, was unencumbered by the estoppel. If the alleged cause of action had arisen before the conveyance to Thomas, and whilst William H. and his mother were jointly possessed, and suit had been brought against them, it seems clear that it could not have been sustained against William H. Not being within the estoppel, his answer to that effect would have defeated the remedy entirely, since the right claimed is of such a nature as not to admit of apportionment among the several part owners. It could not have been enforced against Ann without at the same time injuring the estate and impairing the legal rights of William H. and the other co-tenants, and it will not, I think, be contended that either should suffer

in order to give effect to the estoppel against her. If the interest of William H. was smaller, it was not therefore to be swallowed up to suit the taste or convenience of the owner of the larger part of the estate. If such would have been the result in that action, it seems it should not be different here. The defendants stand in the place of Ann and William H. Through the latter, they have an interest not bound by the estoppel; and if that acquired from the former is, it is nevertheless inoperative, because it cannot be enforced without reaching the interest not bound, as to which they have the same right to protection as the grantor.

Nor can it be urged that William H., by his purchase from Ann, subjected his previous interest to the incumbrance of the Croswell deed. The estoppel was ineffectual at the time of the conveyance, and the property cannot be said to have passed to him in a worse condition. The law subjects the estate in the hands of the grantee to the same burdens and disabilities by reason of the acts of the grantor, as were imposed when it was in the hands of the latter, but not greater ; and if the estoppel was liable to be defeated before, it was equally so after the transfer. If William H. had conveyed to Ann, then his interest might have come under the dominion of the covenants, but not otherwise.

The doctrine of estoppel *in pais* finds no foundation in the facts. It does not appear that the plaintiffs have done any act or incurred any expense in consequence of the representations or conduct of the defendants or William H. Phœnix, as to the plaintiffs' supposed right to open the gate and draw water from the reservoir at the saw mill.

In my opinion the judgment of the court below should be reversed, and the cause remanded, with directions that the complaint be dismissed.

Ordered accordingly.