UNITED STATES *v.* WILLOW RIVER POWER CO.

No. 312.   Argued February 8, 9, 1945.—Decided March 26, 1945.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Shea* and *Miss Cecelia H. Goetz* were on the brief, for the United States.

*Mr. R. M. Rieser,* with whom *Mr. John Wattawa* was on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Willow River Power Company has been awarded $25,000 by the Court of Claims as just compensation for impaired efficiency of its hydroelectric plant caused by the action of the United States in raising the water level of the St. Croix River.   Reality of damage and reasonableness of the award are not in issue.   Our question is

whether the damage is the result of a "taking" of private property, for which just compensation is required by the Fifth Amendment.

Willow River in its natural state was a non-navigable stream, which flowed to within a few rods of the St. Croix River, turned and roughly paralleled it for something less than a mile, and then emptied into the St. Croix. Many years ago an earth dam was thrown across the Willow about a half-mile above its natural mouth. A new mouth was cut across the narrow neck which separated the two rivers and a dam was built across the artificial channel close to or upon the banks of the St. Croix. Here also was built a mill, which operated under the head produced in the pool by the two dams, which obstructed both the natural and the artificial channel of the Willow River.

These lands and appurtenant rights were acquired by the Willow River Power Company, a public utility corporation of the State of Wisconsin, and were devoted to hydroelectric generation for supply of the neighborhood. The plant was the lowest of four on Willow River operated by the Company as an integrated system. The powerhouse was located on land owned by the Company above ordinary high water of the St. Croix. Mechanical energy for generation of electrical energy was developed by water in falling from the artificial level of non-navigable Willow River to the natural level of navigable St. Croix River. The elevation of the head water when at the crest of the gates was 689 feet above mean sea level. The operating head varied because elevation of the tail water was governed by the fluctuating level of the St. Croix. When that river was low, the maximum head was developed, and was 22.5 feet; when the river was at flood stage, the operating head diminished to as little as eight feet. The ordinary high-water mark is found to have been 672 feet, and the head available above that was seventeen feet.

The Government, in pursuance of a Congressional plan to improve navigation, in August of 1938 had completed what is known as the Red Wing Dam in the upper Mississippi, into which the St. Croix flows. This dam was some thirty miles downstream, but it created a pool which extended upstream on the St. Croix beyond respondent's plant at an ordinary elevation of 675 feet. Thus the water level maintained by the Government in the St. Croix was approximately three feet above its ordinary high-water level at claimant's property. By thus raising the level at which tail waters must flow off from claimant's plant, the Government reduced the operating head by three feet, using ordinary high water as the standard, and diminished the plant's capacity to produce electric energy. The Company was obliged to supplement its production by purchase from other sources.

Loss of power was made the only basis of the award. The Court of Claims found as a fact that "The value of the loss in power as a result of the raising of the level of the St. Croix River by three feet above ordinary high water was $25,000 at the time and place of taking," and it rendered judgment for that amount. There is no finding that any fast lands were flooded or that other injury was done to property or that claimant otherwise was deprived of any use of its property. It is true that the water level was above high-water mark on the St. Croix River banks and on claimant's structures, but damage to land as land or to structures as such is not shown to be more than nominal and accounts for no part of the award. The court held that the Government "had a right to raise the level of the river to ordinary high-water mark with impunity, but it is liable for the taking or deprivation of such property rights as may have resulted from raising the level beyond that point." Turning, then, to ascertain what property right had been "taken," the Court referred

to *United States* v. *Cress,* 243 U. S. 316, 329, 330, which it said was identical in facts, and held it had no option but to follow it and that "It results that plaintiff is entitled to recover the value of the decrease in the head of its dam."[1]

The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project. It does not undertake, however, to socialize all losses, but those only which result from a taking of property. If damages from any other cause are to be absorbed by the public, they must be assumed by act of Congress and may not be awarded by the courts merely by implication from the constitutional provision. The court below thought that decrease of head under the circumstances was a "taking" of such a "property right," and that is the contention of the claimant here.

It is clear, of course, that a head of water has value and that the Company has an economic interest in keeping the St. Croix at the lower level. But not all economic interests are "property rights"; only those economic advantages are "rights" which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion. The law long has recognized that the right of ownership in land may carry with it a legal right to enjoy some benefits from adjacent waters. But that a closed catalogue of abstract and absolute "property rights" in water hovers over a given piece of shore land, good against all the world, is not in this day a permissible assumption. We cannot start the process of decision by calling such a claim as we have here a

---

[1] 101 Ct. Cls. 222, certiorari granted, 323 U. S. 694.

"property right"; whether it is a property right is really the question to be answered. Such economic uses are rights only when they are legally protected interests. Whether they are such interests may depend on the claimant's rights in the land to which he claims the water rights to be appurtenant or incidental; on the navigable or non-navigable nature of the waters from which he advantages; on the substance of the enjoyment thereof for which he claims legal protection; on the legal relations of the adversary claimed to be under a duty to observe or compensate his interests; and on whether the conflict is with another private riparian interest or with a public interest in navigation. The claimant's assertion that its interest in a power head amounts to a "property right" is made under circumstances not present in any case before considered by this Court.

Claimant is the owner of lands riparian to the St. Croix River, and under the law of Wisconsin, in which the lands lie, the shore owner also has title to the bed of the stream. *Kaukauna Co.* v. *Green Bay Canal Co.,* 142 U. S. 254, 271; *Jones* v. *Pettibone,* 2 Wis. 308; *Willow River Club* v. *Wade,* 100 Wis. 86, 76 N. W. 273. The case seems to have been tried on the theory that the Company may also claim because of interference with its rights as a riparian owner on the Willow. But the Government has not interfered with any natural flow of the Willow past claimant's lands. Where it was riparian owner along Willow's natural channel claimant already had created an artificial level much above the Government level. If claimant's land along the Willow was at all affected it was at the point where the land was riparian to the artificial channel, just back of the shore line of the St. Croix, where the land had been cut away to install the dam and power plant and to utilize the advantages of being riparian to the St. Croix. We think the claimant's maximum and only interest in the level of the St. Croix arises from its riparian position

thereon and is not helped by the fact that its utilization of riparian lands on the St. Croix involves conducting over them at artificial levels waters from the Willow.

The property right asserted to be appurtenant to claimant's land is that described in *United States* v. *Cress*, 243 U. S. 316, 330, as "the right to have the water flow away from the mill dam unobstructed, except as in the course of nature" and held in that case to be an "inseparable part" of the land. The argument here is put that the waters of the St. Croix were backed up into claimant's tailrace, causing damage. But if a dyke kept the waters of the St. Croix out of the tailrace entirely it would not help. The water falling from the Willow must go somewhere, and the head may be preserved only by having the St. Croix channel serve as a run-off for the tail waters. The run-off of claimant's water may be said to be obstructed by the presence of an increased level of Government-impounded water at the end of claimant's discharge pipes. The resulting damage may be passed on to the Government only if the riparian owner's interest in "having the water flow away" unobstructed above the high-water line is a legally protected one.

The basic doctrine of riparian rights in flowing streams prevails with minor variations in thirty-one states of the Union.[2] It chiefly was evolved to settle conflicts between

[2] The other 17 have some form of the appropriative system. It is based on the principle of priority or seniority, under which rights accrue to users in the order in which they first put waters to beneficial use. The principle is not equal right of use but paramount right in the earlier user. The use is not limited to riparian tracts but may be diverted to sites remote from the stream, thus spreading the benefits beyond riparian lands, a considerable advantage to some arid regions. The beneficial use is more extensive and includes use for irrigation, mining, manufacturing as well as domestic uses, and the water may be permanently diverted and the stream thereby diminished to an extent not allowable under the riparian rights theory. See Bannister, *Interstate Rights in Interstate Streams in the Arid West* (1923) 36 Harv. L. Rev. 960.

parties, both of whom were riparian owners. Equality of right between such claimants was the essence of the resulting water law. "The fundamental principle of this system is that each riparian proprietor has an equal right to make a reasonable use of the waters of the stream, subject to the equal right of the other riparian proprietors likewise to make a reasonable use." [3] With this basic principle as a bench mark, particular rights to use flowing water on riparian lands for domestic purposes and for power were defined, each right in every riparian owner subject to the same right in others above and to a corresponding duty to those below.

The doctrine of riparian rights attained its maximum authority on non-navigable streams. No overriding public interest chilled the contest between owners to get the utmost in benefits from flowing streams. Physical conditions usually favored practical utilization of theoretical rights. In general non-navigable streams were small, shifted their courses easily and were not stable enough to serve as property lines as larger streams often do. They were shallow, could be forded and were no great obstacle to tillage or pasturage on two sides of the stream as a single operation. Such streams, like the lands, were fenced in, and while the waters might show resentment by carrying away a few spans of fence in the spring, the riparian owner's rights in such streams were acknowledged by the custom of the countryside as well as recognized by the law. In such surroundings and as between such owners equality of benefits from flowing waters was sought in the rule that each was entitled to their natural flow, sub-

---

[3] Bannister, *supra,* at 960. Choice of the arid sections of the country of the appropriative in preference to the riparian system is cited in Cardozo, Growth of the Law, 118, 119–20, as an example of "conscious departure from a known rule, and the deliberate adoption of a new one, in obedience to the promptings of a social need so obvious and so insistent as to overrun the ancient channel and cut a new one for itself."

ject only to a reasonable riparian use which must not substantially diminish their quantity or impair their quality. It was in such a stream that this Court found Cress as a landowner under the law of Kentucky possessed "the right to have the water flow away from the mill dam unobstructed, except as in the course of nature." 243 U. S. 316, 330.

Cress owned riparian lands and the bed as well of a non-navigable creek in Kentucky. He built a dam which pooled the water and diverted it to his headrace; after it turned the wheel of his mill, it was returned to the stream by his tailrace. The Government built a dam in the navigable Kentucky River which backed up the water in this non-navigable tributary to a point one foot below the crest of the mill dam, leaving an unworkable head. The Court concluded that Cress was entitled to compensation as for a taking. It found that Cress had the right as a riparian owner to the natural flow-off of the water in this non-navigable stream. The *Cress* case is significant in that it measured the rights of a riparian owner against the Government in improving navigation by the standard which had been evolved to measure the rights of riparian owners against each other. The rights of the Government at that location were held to be no greater than those of a riparian owner, and therefore, of course, not paramount to the rights of Cress.

We are of opinion that the *Cress* case does not govern this one and that there is no warrant for applying it, as the claimant asks, or for overruling it, as the Government intimates would be desirable. The Government there was charged with the consequences of changing the level of a non-navigable stream; here it is sought to be charged with the same consequences from changing the level in a navigable one. In the former case the navigation interest was held not to be a dominant one at the property damaged; here dominance of the navigation interest at the St. Croix is clear. And the claimant in this

case cannot stand in the Cress shoes unless it can establish the same right to have the navigable St. Croix flow tail waters away at natural levels that Cress had to have the non-navigable stream run off his tail waters at natural levels. This could only be done by an extension of the doctrine of the *Cress* case. As we have already said, it "must be confined to the facts there disclosed." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592, 597.

On navigable streams a different right intervenes. While riparian owners on navigable streams usually were held to have the same rights to be free from interferences of other riparian owners as on non-navigable streams, it was recognized from the beginning that all riparian interests were subject to a dominant public interest in navigation. The consequences of the latter upon the former have been the subject of frequent litigation.

Without detailing the long struggle between such conflicting interests on navigable streams, it may point out that by 1909 the lines had become sharply drawn and were then summarized by a leading author:[4] "The older authorities hold that such an owner has no private rights in the stream or body of water which are appurtenant to his land, and, in short, no rights beyond that of any other member of the public, and that the only difference is that he is more conveniently situated to enjoy the privileges which all the public have in common, and that he has access to the waters over his own land, which the public do not." "Access to and use of the stream by the riparian owner is regarded as merely permissive on the part of the public and liable to be cut off absolutely if the public sees fit to do so." And he quoted another writer of standing:[5] "The owner of the bank has no *jus privatum*, or special usufructuary interest, in the water. He does not,

---

[4] 1 Lewis on Eminent Domain (3d ed. 1909) 116, 119.

[5] Wood on Nuisances (1st ed.) § 592.

from the mere circumstance that he is the owner of the bank, acquire any special or particular interest in the stream, over any other member of the public, except that, by his proximity thereto, he enjoys greater conveniences than the public generally. To him, riparian ownership brings no greater rights than those incident to all the public, except that he can approach the water more readily, and over lands which the general public have no right to use for that purpose. But this is a mere convenience, arising from his ownership of the lands adjacent to the ordinary high-water mark, and does not prevent the State from depriving him entirely of this convenience, by itself making erections upon the shore, or authorizing the use of the shore by others, in such a way as to deprive him of this convenience altogether, and the injury resulting to him therefrom, although greater than that sustained by the rest of the public, is *'damnum absque injuria.'* " On the other hand, the author pointed out, there were cases holding that the riparian owners on navigable streams "have valuable rights appurtenant to their estates, of which they cannot be deprived without compensation." He considered this the better rule, and suggested that the courts indicated some tendency to adopt it.

However, in 1913 this Court decided *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53. It involved the claim that water power inherent in a navigable stream due to its fall in passing riparian lands belongs to the shore owner as an appurtenant to his lands. The Court set aside questions as to the right of riparian owners on non-navigable streams and all questions as to the rights of riparian owners on either navigable or non-navigable streams as between each other. And it laid aside as irrelevant whether the shore owner did or did not have a technical title to the bed of the river which would pass with it "as a shadow follows a substance." It declared that "In

neither event can there be said to arise any ownership of the river. Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." 229 U. S. at 62, 69. This Court then took a view quite in line with the trend of former decisions there reviewed, that a strategic position for the development of power does not give rise to right to maintain it as against interference by the United States in aid of navigation. We have adhered to that position. *United States* v. *Appalachian Electric Power Co.,* 311 U. S. 377, 424. The *Chandler-Dunbar* case held that the shore owner had no appurtenant property right in two natural levels of water in front of its lands or to the use of the natural difference between as a head for power production. In this case the claimant asserts a similar right to one natural level in front of his lands and a right of ownership in the difference between that and the artificial level of the impounded water of the Willow River. It constituted a privilege or a convenience, enjoyed for many years, permissible so long as compatible with navigation interests, but it is not an interest protected by law when it becomes inconsistent with plans authorized by Congress for improvement of navigation.

It is conceded that the riparian owner has no right as against improvements of navigation to maintenance of a level below high-water mark, but it is claimed that there is a riparian right to use the stream for run-off of water at this level. High-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid. But the award here does not purport to compensate a flooding of fast lands or impairment of their value. Lands below that level are subject always to a dominant servitude in the interests of navigation and its exercise calls for no compensation. *United States* v. *Chicago, M., St. P. & P. R.*

*Co.,* 312 U. S. 592; *Willink* v. *United States,* 240 U. S. 572. The damage here is that the water claimant continues to bring onto its lands through an artificial canal from the Willow River has to leave its lands at an elevation of 675 instead of an elevation of 672 feet. No case is cited and we find none which holds a riparian owner on navigable waters to have such a legal right. The *Cress* case which the Court of Claims relied upon does not so hold and does not govern here.

Rights, property or otherwise, which are absolute against all the world are certainly rare, and water rights are not among them. Whatever rights may be as between equals such as riparian owners, they are not the measure of riparian rights on a navigable stream relative to the function of the Government in improving navigation. Where these interests conflict they are not to be reconciled as between equals, but the private interest must give way to a superior right, or perhaps it would be more accurate to say that as against the Government such private interest is not a right at all.

Operations of the Government in aid of navigation ofttimes inflict serious damage or inconvenience or interfere with advantages formerly enjoyed by riparian owners, but damage alone gives courts no power to require compensation where there is not an actual taking of property. Cf. *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 179 U. S. 141; *Bedford* v. *United States,* 192 U. S. 217; *Jackson* v. *United States,* 230 U. S. 1; *Hughes* v. *United States,* 230 U. S. 24; *Cubbins* v. *Mississippi River Commission,* 241 U. S. 351. Such losses may be compensated by legislative authority, not by force of the Constitution alone.

The uncompensated damages sustained by this riparian owner on a public waterway are not different from those often suffered without indemnification by owners abutting on public highways by land. It has been held in

nearly every state in the Union that "there can be no recovery for damages to abutting property resulting from a mere change of grade in the street in front of it, there being no physical injury to the property itself, and the change being authorized by law." [6] This appears to be the law of Wisconsin. *Smith* v. *Eau Claire,* 78 Wis. 457, 47 N. W. 830; *Walish* v. *Milwaukee,* 95 Wis. 16, 69 N. W. 818; *McCullough* v. *Campbellsport,* 123 Wis. 334, 101 N. W. 709; cf. *Smith* v. *Washington,* 20 How. 135; *Transportation Co.* v. *Chicago,* 99 U. S. 635. It would be strange if the State of Wisconsin is free to raise an adjacent land highway without compensation but the United States may not exercise an analogous power to raise a highway by water without making compensation where neither takes claimant's lands, but each cuts off access to and use of a natural level.

We hold that claimant's interest or advantage in the high-water level of the St. Croix River as a run-off for tail waters to maintain its power head is not a right protected by law and that the award below based exclusively on the loss in value thereof must be reversed.

MR. JUSTICE REED concurs in the result on the ground that the United States has not taken property of the respondent.

MR. JUSTICE ROBERTS.

I think the judgment of the Court of Claims should be affirmed. The findings of fact by that court are supported by the evidence. They are to the following effect.

The St. Croix River is navigable. The Willow River is a non-navigable stream emptying into the St. Croix at Hudson, Wisconsin. The respondent has constructed several dams in the Willow River for the purpose of gen-

---

[6] 1 Lewis on Eminent Domain (3d ed. 1909) 210.

erating power. The one farthest down stream is "located near the confluence of the Willow River and the St. Croix River in the city of Hudson, Wisconsin, on land owned by [respondent] above ordinary high water of the St. Croix River." At the time of the erection of the respondent's dam, ordinary high water in the St. Croix at Hudson was 672 feet above sea level. The respondent's dam raised the water level in Willow River to a height of 694.5 feet above sea level, thus affording a power head of 22.5 feet.[1]

By the Government's erection of Red Wing Dam the water level in the St. Croix at Hudson was raised to 675.3 feet above mean sea level. The backing up of the water reduced the power head of respondent's dam by approximately three feet, and diminished its supply of power accordingly.

In the court below, the United States denied that the Red Wing Dam had raised the level of the St. Croix at Hudson to the extent claimed by the respondent, and contended that Willow River was a navigable stream and the respondent's dam was, therefore, an obstruction in the navigable waters of the United States for interference with or injury to which the United States was not responsible. These contentions were overruled and are now abandoned. There was no claim by the Government that any portion of the respondent's construction was below

---

[1] The court's opinion refers to the circumstance that the dam in question is not built across the natural channel of Willow River. Neither the court below nor the Government relies on this phase of the case, and I take it that decision does not depend upon it. The facts are that the St. Croix runs substantially from north to south. Willow River, which runs westward, formerly turned southward a short distance from the St. Croix and substantially paralleled the latter before emptying into it. The respondent dammed the natural channel to form a pool just east of the St. Croix, and then built its powerhouse, dam and spillway at a point at the edge of the pool nearest the St. Croix.

ordinary high-water mark in the St. Croix. In fact the Government's answer admitted averments of the petition that the dam and power plant were located *near* a point where the Willow River discharges into the St. Croix River, and upon the respondent's property described in the petition. The answer further alleged that the "dam so constructed by the plaintiff *near* the point where the Willow River discharges into the St. Croix River . . . was constructed upon a concrete foundation extending across or occupying the full width of the mouth of a navigable stream" (meaning the Willow River, which the Government then claimed was navigable). The opinion of the court below states that respondent's tailrace emptied into the St. Croix River below ordinary high-water level, and this seems to be true. But the fact is irrelevant.

The respondent owned the land on either side of the Willow River at and above the point where its dam was constructed. Under the law of Wisconsin the respondent owned the bed of Willow River, and both by common and statute law of Wisconsin it had the right to erect and use the dam.[2] That right was property; and such a right recognized as private property by the law of a state is one which under the Constitution the federal government is bound to recognize. *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312; *Fox River Paper Co.* v. *Railroad Commission,* 274 U. S. 651, 654, 655. Compare *Ford & Son* v. *Little Falls Fibre Co.,* 280 U. S. 369, 375, 377.

---

[2] Revised Statutes Wisconsin 1858, Chap. XLI, §§ 2, 3; Chap. LVI, § 1; Wisconsin Stats. 1943, §§ 30.01 (2) (3) c, 31.07; Wisconsin Laws, Private & Local, 1866, Ch. 122; 1872, Ch. 115; *Mabie* v. *Matteson,* 17 Wis. 1; *A. C. Conn Co.* v. *Little Suamico Lumber Mfg. Co.,* 74 Wis. 652, 43 N. W. 660; *Kaukauna Water Power Co.* v. *Green Bay & M. Canal Co.,* 75 Wis. 385, 390–391, 44 N. W. 638; *Water Power Cases,* 148 Wis. 124, 134 N. W. 330; *McDonald* v. *Apple River Power Co.,* 164 Wis. 450, 160 N. W. 156; *Apfelbacher* v. *State,* 167 Wis. 233, 167 N. W. 244.

Unless *United States* v. *Cress,* 243 U. S. 316, is to be disregarded or overruled, the respondent is entitled to recover for the property taken by the reduction of the efficiency of its dam due to the raising of the high-water mark. If the respondent's power dam had been in Willow River at a distance of one hundred yards or more above the confluence of the two streams, there can be no question that the decision in the *Cress* case would require payment for the injury done to its water power. Since under local law the owner of the land and the dam was entitled to have the water of the non-navigable stream flow below his dam at the natural level of the Willow River, which is affected by the natural level of the St. Croix, the raising of that level by navigation works in the St. Croix invaded the respondent's rights. This is the basis of decision in the *Cress* case. The fact that the respondent's dam is close to the high-water mark of the St. Croix River can not call for a different result.

The court concludes that the *Cress* case is inapplicable by ignoring the finding of the trial court that the increase in level of the St. Croix above high-water mark has diminished the head of respondent's dam by three feet. But to reach its conclusion the court must also disregard the natural law of hydraulics that water seeks its own level. At the confluence of the two rivers at normal high water of the St. Croix, both the St. Croix and the Willow are at the same level. Any increase in the level of the St. Croix above high-water mark must result in raising the natural level of the Willow to some extent. The court below has found that the increase in the level of the St. Croix operates to diminish the head at respondent's dam by the specified amount. The facts thus established are in all relevant respects precisely those on the basis of which this court sustained the recovery of damages in the *Cress* case.

If the fact is that respondent discharges the water from its power plant through a tailrace extending below high-

water mark of the St. Croix, that fact is irrelevant to the problem presented. Respondent claims, and the court below has sustained, only the right to have the flow of the Willow maintained at its natural level. That level has been increased by raising the level of the St. Croix above its high-water mark. The increase in the level of the St. Croix above high-water mark has operated to raise the level below the respondent's dam to an extent which has damaged respondent by diminishing the power head. To that extent respondent has suffered damage and is entitled to recover on principles announced in the *Cress* case.

*United States* v. *Cress* has stood for twenty-eight years as a declaration of the law applicable in circumstances precisely similar to those here disclosed. I think it is a right decision if the United States, under the Constitution, must pay for the destruction of a property right arising out of the lawful use of waters not regulable by the federal government because they are not navigable.

The CHIEF JUSTICE concurs in this opinion.