TOWN BOARD OF ORLAND, Appellant
(Defendant below),

v.

GREENFIELD MILLS, INC., Marian Donley, Lavone and Farl Medlock, Gene and Sharon Lewis, Wilbur C. Hawk and Eleanor Elliot, Appellee (Plaintiff below).

No. 44S05–9507–CV–804.

Supreme Court of Indiana.

March 18, 1996.

George T. McNaughton, Fremont, Bette Dodd, Phillip Scaletta, Ice, Miller, Donadio & Ryan, Indianapolis, for appellant.

Neal Lewis, Neal Lewis & Associates, Orland, for appellee.

SULLIVAN, Justice.

Applying administrative law principles recently enunciated in *Austin Lakes Joint Venture v. Avon Utilities*, 648 N.E.2d 641 (Ind. 1995), we hold that the trial court does not have subject matter jurisdiction to enjoin construction and operation of a sewage treatment plant where the plaintiffs seek solely injunctive relief on grounds that discharge from the project will cause damaging levels of pollution. Rather, we find that the determinations plaintiffs seek here are subject to the administrative and judicial review procedures set forth in the state's water pollution control and permitting statutes. Ind.Code §§ 13-1-3-1 to 13-1-3-22 (1993 & 1995

Supp.) and §§ 13-7-5-2 to 13-7-5-8 (1993 & 1995 Supp.).

### Background

In 1992, the Town of Orland, located in Steuben County, began consideration of the construction of a municipal sewage treatment facility following several years of concern over periodic contamination of one of the two groundwater aquifers serving the community. A feasibility study conducted by the town concluded that construction of a passive lagoon system providing primary and secondary treatment with an accompanying discharge into the Fawn River was the most practical alternative. The town held several public hearings and met informally with groups to discuss the simultaneous extension of the town's water system and the new sanitary sewer system to Wall and Brown Lakes located outside the town. Applications for requisite construction and operating permits were submitted to the Indiana Department of Natural Resources and the Indiana Department of Environmental Management (IDEM). Financing was arranged in the form of (a) a $500,000 grant from the Indiana Department of Commerce; (b) a $2.1 million grant from the federal Rural and Economic Community Development Administration (RECDA); and (c) a $2.1 million subsidized loan from RECDA.

█ No objections had been raised about the project until shortly before Gene Lewis and Sharon Lewis, along with other owners of land abutting the Fawn River, filed this lawsuit to enjoin the town from constructing the proposed system. The town moved to have the matter declared a public lawsuit[1] or, in the alternative, dismissed for failure both to allege a lack of an adequate remedy at law and to exhaust administrative remedies before IDEM. On appeal, the town refined its exhaustion of administrative remedies argument by invoking the administrative law doctrine of primary jurisdiction.[2]

---

**1.** A public lawsuit is "any action whereby the validity, location, wisdom, feasibility, extent or character of construction, financing or leasing of any public improvement by any municipal corporation is questioned directly or indirectly, including but not limited to suits for declaratory judgments or injunctions to declare invalid or to

enjoin such construction, financing or leasing...." Ind.Code § 34-4-17-1(b) (1993).

**2.** The doctrine [of primary jurisdiction] comes into play when a claim is cognizable in a court but adjudication of the claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special

On April 6, 1995, the LaGrange Circuit Court preliminarily enjoined the planning, construction, and permitting of the project. On June 30, 1995, we granted transfer pursuant to Ind.Appellate Rule 4(A)(9). On October 20, 1995, we vacated the preliminary injunction. We write now to explain our decision.

## Discussion

### I

The town contends that the trial court did not have subject matter jurisdiction over this case because the landowners had not exhausted their administrative remedies—that IDEM has primary jurisdiction over the issues raised in the complaint and the trial court therefore had no jurisdiction to proceed.

■ When a court's subject matter jurisdiction is contested on grounds of "exhaustion of remedies," "primary jurisdiction," or similar arguments alleging that the issues presented are within the exclusive jurisdiction of regulatory or administrative agencies to resolve, the court must examine each issue or claim in the case to see if any falls within the jurisdiction of the trial court. *Austin Lakes Joint Venture*, 648 N.E.2d at 646. If all of the issues or claims are clearly matters for exclusive administrative or regulatory agency determination, the court is without subject matter jurisdiction and must dismiss the complaint. Conversely, where at least one of the issues or claims is within the jurisdiction of the trial court, the entire case falls within its jurisdiction. *Id.* In order to determine whether any, all, or some of the issues or claims in this case are matters for exclusive IDEM determination, we proceed to set forth (A) the issues or claims present-

ed by the landowners and (B) the regulatory scheme implicated thereby.

### A

The landowners seek to enjoin construction of the project on grounds that the discharge from the project into the Fawn River would (i) "cause significant environmental damage to the Fawn River and significant damage to the aquatic species of animals and plants" in and along the river; and (ii) violate their constitutionally protected property rights in that it would constitute an "impermissible trespass" upon the landowners' riparian property and would "seriously injure" the landowners' riparian property rights; "seriously interfere" with the landowners' right to use and enjoy their riparian property; and violate the landowners' riparian property rights.

Several aspects of the landowners' complaint are noteworthy. First, the relief they seek is exclusively injunctive; there is no claim for monetary damages. Second, the injunctive relief they seek is prospective; no damage is alleged to be occurring currently. In fact, construction of the project has not begun, pending receipt of a construction permit from IDEM.[3] Third, the grounds on which they seek injunctive relief fall into two general categories: grounds relating to the public impact of the project (the allegations that the project will cause environmental damage generally) and grounds relating to the impact of the project on the landowners' private property rights (the allegations that the project will result in trespass and injury to, interference with, and violation of the landowners' constitutionally protected property rights). However, the gravamen of the second category is really the same as the

competence of [an] administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its views." *Hansen v. Norfolk & Western Ry. Co.*, 689 F.2d 707, 710 (7th Cir.1982), *quoting United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *See Austin Lakes Joint Venture*, 648 N.E.2d at 645–46.

**3.** In these two respects, this case differs from *Guthrie v. McIntyre*, 563 N.E.2d 651 (Ind.Ct.App. 1990), *after remand* 596 N.E.2d 979 (Ind.Ct.App.

1992), *trans. denied*, a case heavily relied upon by landowners. In *Guthrie*, the Court of Appeals held that the trial court erred in determining that downstream riparian landowners' had failed to exhaust their administrative remedies before pursuing their claims against upstream landowners. Without commenting on the holding in *Guthrie*, we note that in that case, unlike here, (i) downstream landowners in *Guthrie* sought monetary damages as well as injunctive relief and (ii) the upstream work in the creek bed complained of had already occurred.

first: that the project will result in unacceptable environmental damage. That is, the trespass and injury to, interference with, and violation of property rights alleged is the pollution of the Fawn River that will result from the project.

## B

Indiana's water pollution control and facility permitting statute, Ind.Code §§ 13–1–3–1 to 13–1–3–22 and 13–7–5–2 to 13–7–5–8, makes clear that construction and subsequent operation of the project are contingent upon receipt of appropriate permits from IDEM. Indiana Code § 13–1–3–10 (1993) requires all plans for any sewage treatment project to be approved by IDEM and Indiana Code § 13–7–7–5(1) and (2) (1993) authorizes the state to promulgate regulations establishing permitting procedures for the construction of sewage treatment projects and setting forth "standards or requirements for discharge or emission specifying the maximum permissible short-term and long-term concentrations of various contaminants of the ... water." The regulations promulgated thereunder prohibit the construction of any sewage treatment project without a valid construction permit issued by IDEM. 327 Ind.Admin.Code § 3–2–1 (1992).

Following construction of any water pollution control or sewage treatment plant, IDEM is also directed by statute to regulate the discharge of any pollutants from the project. Ind.Code §§ 13–1–3–4 (1995 Supp.); 13–1–3–7 (1993); and 13–7–7–5(2)(A) (1993). The regulations promulgated thereunder prohibit the discharge of pollutants from any water pollution control or sewage treatment plant following construction without a valid operating permit issued by IDEM. 327 Ind.Admin.Code § 5–2–2 (1992).

The legislature has provided extensive requirements for public comment and judicial review of these permitting decisions. Indiana Code § 13–7–10–2.5 (1993) provides, at a minimum, that any person who so re-

quests is entitled to notice of any permitting determination. Ind.Code § 13–7–10–2.5(b)(3) (1993). Any person aggrieved by the permit decision may, subject to the terms and conditions imposed by the statute, appeal the decision to the Water Pollution Control Board[4] and request that the Board hold an adjudicatory hearing concerning the determination. Ind.Code 13–7–10–2.5(c)(2) (1993). Any request for an adjudicatory hearing which is properly submitted and establishes the jurisdictional basis for a hearing must be granted. Ind.Code § 13–7–10–2.5(e) (1993). The Board may stay the force and effect of any contested permit provision and any permit term or condition the Board considers inseverable from a contested permit provision. *Id.* Any such adjudicatory hearing is subject to the terms and conditions of the Indiana Administrative Orders and Procedures Act, Ind.Code §§ 4–21.5–1–1 to 4–21.5–7–8 (1993 & 1995 Supp.). This includes extensive provisions under chapter 3 regarding hearings and under chapter 5 regarding judicial review. *See* Ind.Code §§ 4–21.5–3–1 to 4–21.5–3–37 and 4–21.5–5–1 to 4–21.5–5–16. *See also* Ind.Code § 4–21.5–7–1 to 4–21.5–7–8 (containing special provisions for environmental adjudications).

Several aspects of this permitting scheme are noteworthy. First, construction cannot be commenced on the project until IDEM approval has been granted; once construction has been completed, IDEM approval is again required before operation can commence. Second, judicial review of the agency's permitting decisions is provided for. In this regard, it is significant to us that the legislature requires "exhausting all administrative remedies" before seeking judicial review of the permitting decision. Ind.Code § 4–21.5–5–4 (1993). Third, it is clear to us that a principal purpose of this permitting scheme is protection of the environment. The federal statutes implemented by this state statutory and regulatory scheme recite that their purpose is, *inter alia*, "to restore and maintain the chemical, physical, and bio-

---

4. The Water Pollution Control Board, created by Ind.Code § 13–1–3–1 (1995 Supp.), consists of eight members appointed by the governor and three *ex officio* members. It is charged, *inter alia*, with adopting rules for the control of water

pollution in Indiana and developing operating policies governing the implementation of the state water pollution control and facilities permitting statute by IDEM. *See* Ind.Code §§ 13–1–3–1, 13–1–3–2 and 13–1–3–3 (1995 Supp.).

logical integrity of the Nation's waters" and "to assure adequate control of sources of pollutants in each State." 33 U.S.C.A § 1251(a) and (a)(5) (West 1986 & Supp. 1995). And the permitting procedures mandated by our legislature are designed for "the control and prevention of pollution in the waters of this state with any substance which is deleterious to the public health or to the prosecution of any industry or lawful occupation, or whereby any fish life or any beneficial animal or vegetable life may be destroyed or the growth or propagation thereof prevented or injuriously affected." Ind.Code § 13–1–3–4 (1995 Supp.).

## II

■ The landowners in this case (i) seek to prevent construction and operation of the sewage treatment project (ii) on grounds that the discharge from the project will cause damaging levels of water pollution. But the state water pollution control and facilities permitting statute (i) prohibits construction and operation of the sewage treatment project (ii) until the town demonstrates to IDEM[5] that the discharge from the project will comply with state water pollution standards. Thus it appears that the statute here gives IDEM authority over precisely that which landowners seek and, if so, divests the trial court of subject matter jurisdiction over landowners' complaint.

■ *Austin Lakes Joint Venture* makes clear, however, that a trial court is not required to dismiss an action for lack of subject matter jurisdiction merely because a single issue or claim is within the exclusive jurisdiction of an administrative body. In fact, *Austin Lakes Joint Venture* holds just the opposite: If at least one of the issues involved in the case is within the jurisdiction of the trial court, the entire case falls within its jurisdiction, even if one or more of the issues are clearly matters for exclusive administrative or regulatory determination. *Austin Lakes Joint Venture*, 648 N.E.2d at 646. Are there

any issues in the landowners' request for injunctive relief on grounds of either the project's public or private property impact that should be reserved for ultimate resolution by the trial court, once permitting has been completed?

Given that the only challenge to the *public impact* of the project is to the environmental damage it will allegedly cause, we believe that at the end of the permitting process there will be no remaining issues for the trial court to resolve in this regard.[6] *See Reiter v. Cooper*, 507 U.S. 258, 269, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993); *Heckler v. Ringer*, 466 U.S. 602, 617, 619 & n. 12, 104 S.Ct. 2013, 2022–23, 2024 & n. 12, 80 L.Ed.2d 622 (1984). We therefore conclude that the trial court had no jurisdiction to entertain the landowners' request for an injunction on grounds of the public impact of the alleged environmental damage the project would cause.

We next turn to the question of whether the private property rights grounds on which the landowners also seek injunctive relief present at least some issues which are within the jurisdiction of the trial court. Here the landowners invoke our decision in *Austin Lakes Joint Venture* where we concluded that, in a breach of contract claim by a real estate developer against a regulated water utility for failure to furnish promised sewer service, there were no issues in that case to be decided by administrative or regulatory agencies. "In such situations, of course, the doctrine of primary jurisdiction cannot be invoked because there is nothing to refer to the administrative agency or regulatory agency because there is nothing that the agency has the legal authority to decide." *Austin Lakes Joint Venture*, 648 N.E.2d at 647.

■ The landowners in this case seek application of that principle here, arguing that IDEM has no authority "to decide constitutional questions concerning the taking of pri-

---

**5.** Subject to administrative and judicial review if properly sought.

**6.** If the claim challenged other aspects of the project in addition to environmental damage, *e.g.*, the project's legality or financing, the trial

court might well have issues within its jurisdiction to determine following completion of the permitting process. In all likelihood, such a claim would be a public lawsuit under Ind.Code § 34–4–17–1. *See* footnote 1, *supra*.

vate property, ... common law questions concerning duties and restrictions on the use of nonnavigable riparian property, ... [or] questions of common law nuisance." While we do not disagree that, as a general rule, these constitutional and common law questions are matters within the jurisdiction of the trial court, *see Wilson v. Bd. of Ind. Employment Sec. Div.*, 270 Ind. 302, 385 N.E.2d 438, 441 (1979) ("[T]he question presented is of constitutional character ... a subject more appropriate for judicial consideration."), the details of the landowners' claims in this case render the general rule inapplicable here. For while the landowners use the words "trespass," "nuisance," and "taking of and interference with their riparian property rights," all that they ask of the trial court is to prevent construction and operation of a sewage treatment plant because of the damaging levels of pollution they allege it will discharge. But as discussed at length *supra*, the legislature has provided a statutory scheme to decide when a sewage treatment project will be allowed to be built and operated, taking into account the pollution it will discharge, and, in the face of that statute, plaintiffs cannot seek judicial intervention to prevent construction and operation of a sewage treatment plant except in compliance with the statute. *Cf. White Lake Improvement Ass'n v. City of Whitehall*, 22 Mich.App. 262, 177 N.W.2d 473 (1970) (exhaustion of administrative remedies required before court could consider a nuisance action to abate alleged ongoing pollution). *See generally* Jeffrey F. Ghent, *Validity and Construction of Anti–Water Pollution Statutes or Ordinances*, 32 A.L.R.3d 215 (1970).

■ If landowners included in their complaint a request for monetary damages for any taking,[7] trespass, or nuisance caused by discharge from the sewage treatment project, the case might well present issues for ultimate determination by the trial court following completion of the permitting process (including administrative and judicial review thereof).[8] But here landowners do not seek such damages. Instead, they seek to prevent construction of the sewage treatment project in the first place. The legislature has entrusted that determination to IDEM. We therefore hold that the trial court had no jurisdiction to entertain the landowners' request for an injunction on the private property rights grounds of the alleged trespass, nuisance, and unconstitutional taking of property rights.

While subsumed in the foregoing analysis, we do want to comment upon landowners' specific request that we "reaffirm the long-neglected rule of law that a riparian owner of a nonnavigable stream may enjoin pollution or contamination in perpetuity." Landowners direct our attention to a most interesting group of older cases in which relief was provided to downstream owners of riparian rights from upstream pollution. *Penn American Plate Glass Co. v. Schwinn*, 177 Ind. 645, 98 N.E. 715 (1912) (affirming trial court's award of damages to downstream landowner caused by upstream plate glass manufacturer's "obstructing a natural stream, and befouling its waters"); *West Muncie Strawboard Co. v. Slack*, 164 Ind. 21, 72 N.E. 879 (1904) (affirming trial court's award of damages to downstream landowners

---

**7.** We are not asked by the parties in this case to make, and we do not make, any determination as to whether any taking would occur or whether the landowners would be entitled to compensation for the taking or diminution of value of their property in the event the project goes forward. To the extent that there is any "taking" of landowners' property within the meaning of the Fifth Amendment to the United States Constitution and section 21 of the Indiana Bill of Rights, they are, of course, entitled to just compensation. U.S. Const. amend. V; Ind. Const. art. I, § 21. But landowners here seek only injunctive, not monetary, relief. As a general rule, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can

be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984). *See, e.g., McIntyre v. Guthrie*, 596 N.E.2d 979, 981 (Ind.Ct.App.1992) (affirming award of monetary damages to downstream riparian landowners and denial of injunctive relief).

**8.** Under *Austin Lakes Joint Venture*, the trial court would ordinarily keep such issues under advisement until the issues within the jurisdiction of IDEM have been determined. *Id.*, 648 N.E.2d at 647. However, we think the trial court would also have discretion to dismiss such damage claims without prejudice, pending completion of the permitting process.

caused by three upstream factories' discharge of "chemicals and other deleterious substances ... thereby destroying the fish ..., creating noxious vapors, and breeding large numbers of flies and other insects"); *City of Frankfort v. Slipher,* 88 Ind.App. 356, 162 N.E. 241 (1928) (affirming trial court's award of damages to downstream landowner caused by upstream city's discharge of unpurified sewage). They also point us to the following language from the United States Supreme Court:

> The doctrine of riparian rights attained its maximum authority on non-navigable streams.... In such surroundings and as between such owners equality of benefits from flowing waters was sought in the rule that each was entitled to their natural flow, subject only to a reasonable riparian use which must not substantially diminish their quantity or impair their quality.

*United States v. Willow River Power Co.,* 324 U.S. 499, 505, 65 S.Ct. 761, 765, 89 L.Ed. 1101 (1945).

It appears to us, however, that however strong the historical precedents may have been for court intervention to protect downstream landowners,[9] those common law doctrines have been abrogated—at least with respect to public sewage treatment projects—by the enactment of the statutory scheme governing the construction and operation of such projects. As discussed *supra,* the legislature has, with the express purpose of protecting the state's waters, prohibited the construction and operation of sewage treatment projects without requisite permits and created procedures for persons such as the landowners to participate in the permitting process. And this regulatory scheme makes no distinction, as landowners ask us to make here, between navigable and nonnavigable waters.[10]

### Conclusion

Having previously granted transfer and vacated the trial court's preliminary injunction, we now remand this matter to the La-Grange Circuit Court with instructions to dismiss landowners' complaint with prejudice.

SHEPARD, C.J., DeBRULER, AND DICKSON, JJ., concur.

SELBY, J., not participating.

---

**9.** We do feel constrained to say that we find landowners' authority unconvincing. In none of the three Indiana cases cited was injunctive relief provided, only monetary damages. And in *City of Frankfort,* the Appellate Court affirmed the city's liability in part because the city had not adopted "a reasonable and practical means of disposing of the sewage by the installation of a modern method of its treatment." *Id.* 88 Ind. App. at 364, 162 N.E. 241. As to the passage from *Willow River Power Co.* cited, we observe that the omitted second sentence of the paragraph reads, "No overriding public interest chilled the contest between owners to get the utmost benefits from flowing streams." *Id.,* 324 U.S. at 505, 65 S.Ct. at 765. There is, of course, a public interest at stake in this case. Furthermore, the court in *Willow River Power Co.* reject-

ed a power company's contention that the impaired efficiency of its hydroelectric plant caused by the action of the United States in raising the water level of the St. Croix River River constituted a "taking" of its private property.

**10.** " 'Waters' means the accumulations of water, surface and underground, natural and artificial, public and private, or parts thereof, that are wholly or partially within, flow through, or border upon this state. The term does not include any private pond or any off-stream pond, reservoir, or facility built for reduction or control of pollution or cooling of water prior to discharge unless the discharge from the pond, reservoir, or facility causes or threatens to cause water pollution." Ind.Code § 13–7–1–27.