**Albert J. AVENAL, Jr., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–261L.**

United States Court of Federal Claims.

Aug. 2, 1995.

Michael X. St. Martin and Carolyn A. McNabb, Houma, LA, for plaintiffs.

Thornton Withers Field, Washington, DC, with whom was Asst. Atty. Gen. Lois J. Schiffer, for defendant. Marco A. Rosamano, U.S. Army Corps of Engineers, New Orleans Dist., RED, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant's motion for summary judgment. The issue is whether plaintiffs, who lease certain water-bottoms in the Breton Sound Basin, Louisiana, for oyster farming, hold a compensable property interest for purposes of the Fifth Amendment.

## FACTS

The following facts are undisputed, except where noted. On October 27, 1965, Congress enacted the "Public Works—Rivers and Harbors Act," Pub.L. No. 89–298, 79 Stat. 1073 (1965) (the "Act"), which authorized certain freshwater diversion structures to be built in and around the Breton Sound Basin, which lies east of the Mississippi River and south of New Orleans, Louisiana. The location and description of the approved structures originally were set forth in a memorandum dated June 16, 1959, from the United States Department of the Interior, Fish and Wildlife Service to the United States Army Corps of Engineers (the "Corps") (the "1959 memorandum") and later incorporated into House Document No. 308, which Congress approved in the Act.

The 1959 memorandum represents the conclusions of the Fish and Wildlife Service concerning its investigation as to the advisability of introducing fresh water from the Mississippi River into the sub-delta marshes below New Orleans, Louisiana, via freshwater diversion structures. The investigation was prompted, in part, by requests from local groups, including the oyster industry, which attended a public hearing in New Orleans on April 25, 1955, concerning the need for freshwater diversions.

The coastal waters of Louisiana historically provided excellent conditions for oyster growth, because the area contained a broad mixing zone of freshwater outflow from the Mississippi River and smaller coastal streams and the saline waters of the Gulf of Mexico. According to the 1959 memorandum, certain man-made and natural causes, over time, had increased the salinity level of the sub-delta marsh lands below New Orleans, thereby adversely affecting fish and

wildlife, including oysters, waterfowl, and fur animals. The parties attribute the changes in salinity primarily to man-made causes, including the Federal Government's involvement in the creation of a levee system for flood protection of the Mississippi River and the oil and gas industry's creation of extensive canal networks. The record indicates that the Corps became involved in levee projects as early as 1927.[1] The natural causes resulting in increased salinity stemmed from subsidence, shoreline erosion, and severe drought.

The optimal salinity level for oysters ranges from 5 parts per thousand ("ppt.") to 15 ppt. Oysters, for various reasons, cannot survive in salinity levels beyond this range. The 1959 memorandum specifies that, as early as 1900, the Louisiana Wildlife and Fisheries Commission [2], its predecessors, and various parishes had recommended that freshwater be diverted from the Mississippi River to adjacent marsh lands in order to improve oyster habitats and to reduce the mortality rate associated with increased salinity.

After finding "a marked reduction [in oyster yield] per unit area" over time,[3] the Fish and Wildlife Service in the 1959 memorandum concluded that "[i]ntroduction of fresh water *to re-establish natural patterns of salinity* and alluviation and increase fertility would provide the most effective method of restoring fish and wildlife production." (Emphasis added.) The 1959 memorandum identified four separate areas in Plaquemines Parish as freshwater diversion sites, two of which were located on the west side of the Mississippi, Areas No. 1 and 3, and two on the east side, Areas No. 2 and 4. The diversion structures were designed to benefit both public seed grounds and privately-held water-bottom leases obtained from the state for oyster farming.

The freshwater diversion control structure for Area No. 4, to be located in the vicinity of Scarsdale, in the upper landward end of the Basin, was intended to carry waters to Grand Lake. The 1959 memorandum defined Area No. 4 as being "too fresh to support an oyster fishery, but . . . one of the best muskrat marshes in Louisiana. . . ." According to the memorandum, "[w]ater discharge requirements in this area differ[ed] from the other [three] areas in that the major purpose . . . [was] not to effect a 50 percent dilution. . . . [but] rather to prevent and push back salt-water intrusion . . . to combat the effects of subsidence and destruction of vegetation by muskrats. . . ." The memorandum finally stated: "Pollution would not be a problem in Area No. 4 as in the other areas because an oyster fishery . . . [was] not present. . . ." Thus, as of 1959, areas in the vicinity of Scarsdale, located in the upper landward end of the Breton Sound Basin, had no recognizable oyster industry because the waters were too fresh to sustain such a habitat.

Between 1968 and 1969, the Corps met with local interests, including the Louisiana Wildlife and Fisheries Commission and the Plaquemines Parish Commission Council, to discuss proposed locations for the diversion structures authorized by Congress. During Corps-sponsored public hearings held in No-

---

1. Defendant's expert, Coastal Environments, Inc., states in a report dated February 1995, at p. 2–14: "Following the great flood of 1927, the Mississippi River Commission and the Corps of Engineers devised a plan to direct flood waters safely to the Gulf. The plan included channel straightening and training, levee improvements, and construction of several major spillways or floodways. . . ." Defendant acknowledges that the state did play a role in the flood control projects. These facts are recited as background.

2. Although the Louisiana Wildlife and Fisheries Commission has been renamed on various occasions before and after 1959, the court, for purposes of clarity, shall refer to the organization under this name.

3. Plaintiffs contend that Louisiana's oyster production has remained constant for three decades. Although defendant does not dispute this proposed finding, in response to a separate proposed finding, defendant proffered expert reports which stipulate that " '[w]hile Louisiana's oyster production from private grounds has remained relatively stable during 1961–1988 ranging from 7.5 to 10.1 million pounds, the acreage devoted to the production of these oysters has increased more than five times.' " Def's Reply to Plfs' Statement of Genuine Issues of Fact No. 27, filed June 2, 1995 (quoting Berrigan, et al. (1991)). Although the 1959 memorandum supports defendant's position, the court does not resolve this issue on summary judgment. It is not material to the issue for resolution, in any event.

vember and December 1968, the Corps proposed Caernarvon as the situs of the freshwater diversion structure for Area No. 4 to be located on the east side of the Mississippi.[4] According to defendant's expert report, Caernarvon is located "only a few miles downstream" from Scarsdale. Report of Coastal Environments, Inc., pp. 4–6 (Feb. 1995). It is within the general vicinity of Scarsdale, a fact that plaintiffs do not dispute, and therefore falls within the area described by the 1959 memorandum as the site for the control structure at Area No. 4.

In 1969 the Louisiana Wildlife and Fisheries Commission, the Plaquemines Parish Commission Council, and the Corps agreed to construct a freshwater diversion structure in the vicinity of the Nestor Canal in the Bohemia Spillway area on the east bank of the Mississippi River. In discussing Area 2, the second diversion structure to be located on the east bank, the 1959 memorandum specified that the diversion structure should be built in the vicinity of Bohemia; the Nestor Canal satisfies this locational requirement.

During the 1970's the zone favorable for oyster growth continued to move landward, due to salinity changes. This landward salinity movement spawned an oyster community in the marsh lands in the northwest portion of the Breton Sound Basin, which had previously been too fresh to sustain such growth. While creating new oyster grounds, the inland movement of salinity had the deleterious effect of rendering unusable large areas of previously productive oyster grounds.[5] Many in the oyster industry noted the changed conditions in the northwest landward part of the Basin and entered into water-bottom lease agreements with the Louisiana Wildlife and Fisheries Commission. The leases extended for 15 years and covered a maximum of 1,000 acres.[6]

Between 1978 and 1982 the Corps and relevant state and local agencies continued to discuss at informal meetings constructing a freshwater diversion structure at Caernarvon. On January 21, 1982, the State of Louisiana submitted a letter to the Corps, announcing its intent to participate in the Caernarvon freshwater diversion project. The Corps and the Louisiana Department of Natural Resources issued a joint public notice as to the construction surrounding the Caernarvon project in 1982. In May 1982 the Corps also issued a draft report and environmental impact statement, entitled *Louisiana Coastal Area, Louisiana, Feasibility Report on Freshwater Diversion to Barataria and Breton Sound Basins*, addressing the importance of the Caernarvon structure. The Corps issued the final report in September 1984.

The final report provided for only one large freshwater diversion structure to be constructed at Caernarvon, even though the Act authorized the construction of two smaller structures on the east side of the Mississippi River.[7] "The zone where condi-

4. The record is unclear as to whether the 1968 and 1969 meetings were intended to identify the diversion structure locations for the areas discussed in the 1965 Act, or whether such meetings concerned other non-authorized diversion projects. When questioned as to the purpose of the meetings, defendant implied that the meetings occurred in response to the Act. Defendant, however, did not respond as to whether the 1968 and 1969 meetings pertained to Areas No. 2 and 4, discussed in the 1959 memorandum. Given the substance of the 1959 memorandum, the court infers that the meetings did address proposed locations for Areas No. 2 and 4.

5. The massive oyster mortality on formerly productive private leases and state seed grounds had been a source of concern for the State of Louisiana since the 1940s.

6. The lease includes both general provisions and conditional clauses, the latter of which are project-specific. The general provisions of the lease changed over time. In 1976 the louisiana Wildlife and Fisheries Commission inserted the following: "This lease is also subject to Commission policies not stipulated by regulations...." Def's Proposed Findings of Fact No. 73, filed Feb. 7, 1995. Between 1988 and 1990, the Commission again modified the lease to include a hold-harmless provision, which precluded lessees from seeking damages from the state for losses resulting from freshwater diversion projects. According to defendant, leases issued prior to the 1988–1990 timeframe were not amended to include a hold-harmless clause.

7. Although during argument the court inquired of defendant as to the date of the decision to consolidate the two structures designated in the 1959 memorandum, defendant could not provide the exact date on which the decision was made.

782

tions will become too fresh for oyster cultivation as a result of the [Caernarvon] diversion coincides with an area that was historically (prior to 1960) too fresh and not favorable for oyster cultivation." Def's Proposed Findings of Fact No. 8, filed Feb. 7, 1995 (citations omitted). Plaintiffs do not dispute this fact.

The Caernarvon project was designed not only to abate saltwater intrusion, but also to abate marine tidal invasion. At the July 31, 1984 public hearing, the President of the Louisiana Oyster Dealers and Growers indicated his support for both the Caernarvon project and freshwater diversion structures generally.

On October 30, 1986, Congress authorized the funds for the construction of the Caernarvon project through the Fiscal Year 1987 Energy and Water Development and Appropriations Act, Pub.L. No. 99–591, 100 Stat. 3341, 3341–195 (1986). Although the State of Louisiana expressed its intent to participate in the Caernarvon project as early as January 1982, the state did not enter into a formal cooperation agreement with the Corps until June 10, 1987. That agreement identified the Caernarvon project as one of the four sites originally authorized by the Act:

> WHEREAS, the Mississippi River and Tributaries Project was authorized by the Flood Control Act of 1928 (May 15, 1928, Public Law No. 70–391) and modified and expanded by the Flood Control Act of 1965 (October 27, 1965, Public Law 89–298) to include the Mississippi Delta Region Project as recommended by the Chief of Engineers in House Document No. 308, 88th Congress, 2d Session; and
>
> WHEREAS, *the Caernarvon Freshwater Diversion Structure (hereinafter referred to as the "Project") is one of the four sites authorized under the Lower Mississippi Delta Region project by the Flood Control Act of 1965* (October 27, 1965, Public Law 89–298)....

(Emphasis added.)

The agreement stipulated that the state shall maintain and operate the facilities fol-

lowing completion of construction, and that the state shall be responsible for 25 percent of the total costs of construction. The agreement further provided an indemnification clause, whereby the state would indemnify the Federal Government for any losses occasioned by claims for "damages arising from the construction, operation, maintenance, and rehabilitation of the project, except [that the state would not indemnify] for damages due to the fault or negligence of the Government or its contractors."

Construction commenced at the Caernarvon site on June 7, 1988, and was completed in February 1991. The Caernarvon project, however, was not the first freshwater diversion structure to be constructed in the area. The State of Louisiana constructed the Bayou Lamoque freshwater diversion structure in 1956 and expanded the structure in 1975. Other diversion structures in the area included the White (or Whites) Ditch Siphon, completed in 1964. The Caernarvon project, in fact, was modeled after these smaller state and local ventures, which had proved effective in restoring oyster production previously destroyed by excessive salinities.

On April 26, 1994, several owners of waterbottom leases, who, at the earliest, acquired their leases for oyster farming by 1976,[8] filed a complaint in the United States Court of Federal Claims, alleging a taking of their leasehold interests resulting from the Caernarvon project. Specifically, plaintiffs alleged that the Caernarvon project diluted the salinity level in the waters above their leased grounds and caused silt deposits in the leased area. These conditions were not favorable to oyster growth, and therefore plaintiffs claim that the Federal Government through the Caernarvon project disabled them from continuing to cultivate oysters.

Although the record does not reflect the exact location of plaintiffs' leases, plaintiffs concede that the leases were located in areas which prior to 1960 were too fresh to sustain

---

Information of record, however, does indicate that the decision was made by 1982.

8. The record is devoid of any evidence as to the exact dates on which the plaintiffs acquired their

leases. During argument, defendant explained that he derived the 1976 date by subtracting 15 years, the length of the state lease, from the date on which Caernarvon opened, which was 1991.

oyster growth. *See* Plfs' Br. filed May 2, 1995, at 3 (stating that "saltwater intrusion ... has led to the displacement of areas previously (pre–1960) having favorable oyster growing conditions in the outer Breton Sound Basin and the development of additional, inner Breton Sound Basin areas more favorable to oyster growing conditions, which were previously (pre–1960) too fresh for oyster habitats....") (citations omitted). In defining the location of these areas previously too fresh for oyster development, plaintiffs discuss the northwest landward end of the Breton Sound Basin, which is the same general area covered by Area No. 4 identified in the 1959 memorandum.

Plaintiffs also filed a motion for class certification on April 26, 1994, seeking to certify as a class hundreds of oyster lessees of water bottoms in the vicinity of the Breton Sound Basin whose leases had been impaired by the activity of the Federal Government through the Caernarvon project. There are 130 named plaintiffs in the action, some of whom hold an undivided fractional interest in only a few acres; others are the sole lessees of 1,000 acres, the maximum amount that may be leased under state law. In an order dated July 21, 1994, the court deferred decision on the motion.

Defendant moved for summary judgment, arguing that plaintiffs' takings claim must fail because they lack a compensable property interest for purposes of the Fifth Amendment. In support of their opposition, plaintiffs filed additional proposed findings of uncontroverted fact pursuant to RCFC 56(d). Specifically, plaintiffs note that over 25 years had passed between the issuance of the 1959 memorandum proposing four diversion structures, two of which were to be located on the east bank of the Mississippi River, and the issuance of the final report in 1984, listing Caernarvon as the only freshwater diversion site on the east bank. Accordingly, plaintiffs maintain that they could not be charged with notice as to the exact locations or specific effects of the Caernarvon project.

Defendant rejoins that "[b]ecause of the natural configuration and hydrology of the Breton Estuarine Basin, the upper and middle basins would have become fresher regardless of the specific location of the diversion or regardless if one or more structures had been built...." Def's Reply to Plfs' Statement of Genuine Issues of Fact No. 64, filed June 2, 1995. Defendant points out that plaintiffs do not contest that one of the original objectives of the project was to restore historic freshwater conditions to the upper and middle basins. Moreover, the record shows that the areas leased by plaintiffs historically were too fresh for oysters to flourish.

Plaintiffs also maintain that they reasonably could not have foreseen where salinity changes would occur due to the project, because the Corps erred in forecasting future salinity ranges in its final report issued in 1984. Plaintiffs contend that the Corps' projected salinity estimates are inconsistent with actual data obtained once the project was operational. Defendant disputes this characterization, claiming that the report identified long-term salinity estimates and, therefore, that it is inappropriate to cite data received over a one- to two-year period and point to inaccuracies. In addition, defendant contends that the evidence accumulated to date has shown both that the project's benefits with respect to the public seed grounds had exceeded expectations and that historic salinity conditions were being restored, a stated goal of the project. *See* Def's Statement of Genuine Issues in Reply to Plfs' Additional Proposed Findings of Uncontroverted Fact No. 4, filed June 2, 1995 (quoting Memorandum from Robert L. Ancelet, 1994–95 Oyster Season Forecast (1994)) (stating that " '[i]n Coastal Study Area II, oyster availability has increased for the third consecutive year, an unprecedented reversal of the general trends observed since 1975....' ").

Finally, plaintiffs assert that the Caernarvon Project has increased the areas subject to seasonal closures. The Louisiana Department of Health periodically closes certain areas of leased water bottoms throughout the season due to increased levels of fecal coliform, a bacterium. Defendant questions the support plaintiffs cite for their factual assertion. Defendant further contends that the problems associated with increased levels of fecal coliform have plagued oyster farmers

for years. The increased levels occur as a result of many factors, including pollution from urban runoff, which occurs frequently following heavy or torrential rainfall. Defendant also notes that the closure areas highlighted by plaintiffs are not restricted to the Caernarvon area and that the areas approximate the scope of those occurring prior to the opening of the Caernarvon structure.

## DISCUSSION

### 1. *Summary judgment*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ Due to the ad hoc nature of takings inquiries, the issues involved are normally fact issues that must be determined either on the entirety of a complete record or at trial. *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1560 (Fed.Cir.1985); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 891 (Fed.Cir.1983). The harsh finality of summary judgment also dictates "its application must be accompanied by great care in respect of the entire record and the relevant law...." *Yuba Goldfields*, 723 F.2d at 891. In *Celotex* the Supreme Court stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof....

477 U.S. at 322–23, 106 S.Ct. at 2552. An opponent of summary judgment "must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant...." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *see Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984). Argument and assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir.1984). If defendant submits an affidavit on a material point, plaintiffs must respond with an affidavit. *See Royal Indem. Co. v. United States*, 178 Ct. Cl. 46, 51, 371 F.2d 462, 465, *cert. denied*, 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967). Nonetheless, an opponent of summary judgment is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Although "[t]he fact-intensive nature of just compensation jurisprudence to date ... argues against precipitous grants of summary judgment ..., [t]here ... [are] cases in which the United States as the moving party is 'entitled to judgment as a matter of law, and where it is quite clear what the truth is....'" *Yuba Goldfields*, 723 F.2d at 887 (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Because the parties do not dispute the facts material to a dispositive issue, this is an example of such a case.

### 2. *Takings*

■ For a takings claim to succeed under the Fifth Amendment, under either a physi-

cal invasion or regulatory takings theory, a claimant must first establish a compensable property interest. *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——–——, 112 S.Ct. 2886, 2899–900, 120 L.Ed.2d 798 (1992); *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir. 1993); *Preseault v. United States,* 27 Fed.Cl. 69, 84 (1992), *appeal pending,* No. 93–5067 (Fed.Cir. argued Dec. 9, 1993); *see M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995) (holding that takings claim involving governmental action resulting in land use restriction requires two-step analysis; first is to identify whether compensable property interest exists).

■ However, "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them...." *United States v. Willow River Power Co.,* 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945); *see Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (noting that courts dismiss takings claims where "the challenged government action [which] caused economic harm ... d[oes] not interfere with interests that ... [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes") (citations omitted); *Skip Kirchdorfer,* 6 F.3d at 1580 (holding that "[n]ot all losses generate a Fifth Amendment taking...."; landowner must establish "a legally-cognizable property interest") (citation omitted); *Shanghai Power Co. v. United States,* 4 Cl. Ct. 237 (1983) (same), *aff'd,* 765 F.2d 159 (Fed.Cir.) (Table), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). For example, a landowner cannot acquire a property interest in the high-water level of a navigable river. *Willow River,* 324 U.S. at 511, 65 S.Ct. at 768; *see Lewis Blue Point Oyster Cultivation Co. v. Briggs,* 229 U.S. 82, 87–88, 33 S.Ct. 679, 680, 57 L.Ed. 1083 (1913) (holding that landowner holds title to submerged lands under navigable waters, but title is qualified because it is subordinate to United States' right of navigation).

■ Once a legally-cognizable property interest is established, the court must identify the nature of the taking, be it physical or regulatory. If the governmental action constitutes a regulatory taking, the court then applies the well-established three-prong test, requiring analysis of " 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.' " *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (quoting *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980)) (citations omitted).

■ Without providing authority, plaintiffs argue that they need not establish the existence of a compensable property interest when the governmental action effects a physical taking. Defendant rejoins that the compensable property interest requirement applies regardless of the nature of the taking. The court agrees with defendant: The issue on defendant's motion is whether plaintiffs hold a compensable property interest.

To make this determination, the court must evaluate plaintiffs' " 'bundle of rights' " as of the time they acquired the property at issue, which, at the earliest, in this case occurred in 1976. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2899; *Preseault,* 27 Fed.Cl. at 87. The court must also examine " 'existing rules or understandings that stem *from an independent source such as state law*' to define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) Amendments." *Lucas,* —— U.S. at ——, 112 S.Ct. at 2901 (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)) (emphasis added; citations omitted); *see Preseault,* 27 Fed.Cl. at 87 (ruling that *Lucas*' approach for determining the existence of compensable property interest applied to cases concerning regulations that cause or authorize physical invasions).

### 3. Compensable property interest

■ This case, which involves multiple federal projects,[9] multiple benefits, and mul-

---

9. Although the state contributed 25 percent of    the overall costs of the Caernarvon project, the

tiple causes, is sui generis. Generally, the case involves a situation wherein the Federal Government performed various public works projects, including erecting levees in the Mississippi River area. Although the levees had the intended benefit of halting the continued flooding of the Mississippi River, they had the unintended effect of increasing the salinity level in the marsh lands of the Breton Sound Basin. The increased salinity resulting from the levee projects caused the zone favorable for oyster growth to move inland over the years, thereby creating areas favorable for oyster growth. Prior to 1960 the same areas were too fresh to sustain such growth.

Plaintiffs do not dispute that the salinity in the marsh lands increased primarily because of federal levee projects and canal work undertaken by private industry. Plaintiffs even admit that the "saltwater intrusion ... was largely due to the vast systems of levees which Defendant itself constructed...." [10] Plfs' Br. filed May 2, 1995, at 26. Plaintiffs also admit that the areas they leased were too fresh prior to 1960 for oysters.

Defendant argues that regardless of how the court characterizes the taking allegedly resulting from the operation of the Caernarvon project, plaintiffs hold no "property right in the maintenance of artificially high salt water in the area of the[ir] leases." [11] Def's Br. filed May 31, 1995, at 1. Defendant's

argument is premised on the notion that plaintiffs hold no compensable property interest in the value of their leases, given the congressional authorization of freshwater diversion structures in 1965. This argument implicates the decision in *Preseault*, which held that federal law inherently limited the expectancy of an owner of a reversionary interest in a railroad easement.

■ *Preseault* is distinguishable from the instant case because in the former the landowner was subject to both the state and federal regulatory systems, which historically had been intertwined. Given the historical relationship of the regulatory programs, it was appropriate for the court to look to federal law in defining the landowners' property rights. In contrast, the nature of the property interest in this case does not hinge on federal law. The interest is defined solely by state, not federal, law. For purposes of state law, a leasehold interest is generally recognized as a property interest. *Lewis Blue Point Oyster*, 229 U.S. at 87, 33 S.Ct. at 680; *see 767 Third Ave. Assoc. and Sage Realty Corp. v. United States*, 48 F.3d 1575, 1578 n. 2 (Fed.Cir.1995) (individual's right to income under lease constitutes property for purposes of Fifth Amendment) (citing cases).

Alternatively, defendant argues that even though a lease generally gives rise to a property interest—in that it is alienable, descendible, and renewable as of right—plaintiffs

project, for purposes of this case, was federal in nature. *See Vuljan v. Board of Comm'rs of the Port of New Orleans*, 170 So.2d 910, 912–13 (La.Ct.App.), *writ refused by* 247 La. 616, 172 So.2d 701 (1965).

10. While plaintiffs assert that the unintended effect of salinity resulted "largely" from federal levee projects, Plfs' Br. filed May 2, 1995, at 26, the court notes that defendant refers to both state and federal efforts in the area of flood control. To give plaintiffs the benefit of "all applicable presumptions, inferences, and intendments," *H.F. Allen Orchards*, 749 F.2d at 1574, the court adopts plaintiffs' characterization that the Federal Government largely was responsible for the unintended benefit of salinity.

11. In their complaint and additional proposed findings of fact submitted pursuant to RCFC 56(d), plaintiffs contend not only that the Caer-

narvon project adversely affected salinity levels, but also that the project caused silt deposition on their oyster beds, destroying their harvests. Defendant disputes plaintiffs' characterization, maintaining that plaintiffs' leases could not have been affected by silt deposits because the evidence demonstrates that silt falls out before the 5 ppt. isohaline level.

Although the parties dispute the issue of siltation, it will not preclude entry of judgment on defendant's motion. RCFC 56(d)(1) requires the proponent of a proposed finding (here plaintiffs offered this fact as an additional proposed finding under RCFC 56(d)) to provide appropriate substantiation. Plaintiffs advance the siltation phenomenon as a fact, yet proffer no support. *See* RCFC 56(d)(1) ("Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.").

hold no compensable property interest because of the nature of the *res* that is being leased. Relying first on the provisions of the state leases, defendant asserts that plaintiffs hold no compensable expectancy in the continued salinity of the waters above their leased grounds. Defendant correctly contends that the terms of the leases define plaintiffs' property rights under state law. According to defendant, although the state leased certain submerged acreage to individuals, such as plaintiffs who farm oysters, the state guaranteed neither the continued salinity level of the waters above the leased grounds, nor the continued fertility of the leased lands for oyster growth.

Plaintiffs concede that *"the leases themselves do not purport to warrant the quality of water* over the leases nor guarantee that the leases will not be subject to state and federal efforts to protect natural resources...." Plfs' Br. filed May 2, 1995, at 23 (emphasis added).[12] Plaintiffs have not placed into the record copies of any lease agreements which would indicate anything to the contrary. In light of plaintiffs' admission, the court concludes that, based on state law, plaintiffs hold no compensable expectancy in the salinity of the waters above their leased acreage, which rendered their lands fertile.

Notwithstanding plaintiffs' admission, defendant further argues that plaintiffs cannot hold a property right in the artificial, non-historical condition of salinity above their leased grounds. This is so, defendant continues, because the federal levee projects in large part caused the salinity, and the artificial condition consistently had been recognized by local, state, and federal governments as both injuring the oyster industry and as requiring remediation in order to restore habitats favorable to oysters and waterfowl. Thus, according to defendant, plaintiffs have no compensable property interest

in the existence or maintenance of the artificial condition that fostered oyster growth; the condition inhered in the nature of plaintiffs' interest.

According to defendant, plaintiffs, at best, have an unwarranted benefit from a flood control project, not a property right. It is well established that a lessor in creating a leasehold cannot convey rights to the lessee which the lessor itself does not possess. In this case the salinity level in the area of plaintiffs' leases, and the corresponding fertility of that acreage, occurred primarily as a result of federal levee projects.[13] If the state possessed no vested interest against the Federal Government in the saline condition of the waters, plaintiffs derivatively cannot claim such an interest.

The issue, a question of first impression, devolves to whether plaintiffs have a vested right, derived from the state, in an unintended benefit resulting from a federal government project, such that cessation of that benefit, due to the consequences of a separate federal project, warrants compensation under the Fifth Amendment. The court holds that the state acquired no vested interest in the salinity of the waters above the leased grounds and that therefore plaintiffs cannot claim such an entitlement. The court does not rule, as defendant argues, that a landowner can never have a compensable property interest in an artificial condition.

Although afforded the opportunity in briefing and during argument to address this issue, plaintiffs proffered no reply. Plaintiffs' only evidence of a compensable expectancy was that the oyster industry was an important and historic industry in Louisiana. *See* Transcript of Proceedings, *Albert J. Avenal, Jr., et al. v. United States,* No. 94–261L, at 31–32 (Fed.Cl. July 18, 1995) ("And with regard to compensable expectancy, I can tell you that Louisiana certainly has depended

---

**12.** The quoted sentence concludes: "[H]owever, the leases need not contain a guarantee that the federal government will pay just compensation to the leaseholder should the lease be destroyed— the Fifth Amendment guarantees plaintiffs this cause of action." Plfs' Br. filed May 2, 1995, at 23. While the court agrees that plaintiffs are not prohibited from pursuing a claim for just com-

pensation under the Fifth Amendment, plaintiffs' admission undercuts their right to compensation, because the admission pertains to whether plaintiffs possess a compensable property interest, a necessary component of a viable takings claim. *See supra* pp. 784–86.

**13.** *See supra* note 10.

upon the oyster farmers for the last 30 or 40 years. Louisiana produces over half ... of all the oyster production in the United States....").

#### 4. The unintended effects of a federal government project

Defendant relies on *Allain–Lebreton Co. v. Department of Army*, 670 F.2d 43 (5th Cir. 1982), to support its argument that plaintiffs cannot claim a property right in an unintended benefit resulting from a federal government project. In *Allain* a company alleged that the Corps' decision not to locate a hurricane protection levee on a certain portion of its lands constituted a taking of its property. The company argued that but for the Corps' veto, the levee district would have approved the proposed easement for the levee. The court held that a decision not to take certain property does not interfere with property rights and that therefore no compensation was due. The refusal to take merely denied the company of a business opportunity and the Federal Government need not pay for such lost opportunities. *Allain* does not support defendant's theory since the Federal Government took no property in that case. In contrast, the Caernarvon project allegedly interfered with plaintiffs' oyster farming by adversely affecting the salinity level, thereby allegedly effecting a physical taking.

The case law provides some guidelines, but not direct authority. The issue of whether plaintiffs hold a vested right in the unintended benefit of salinity in the area of their leases resulting from the Federal Government's levee projects can be analogized loosely to the issue of whether welfare recipients hold a substantive property right in the entitlements rendered pursuant to government programs. It is well established that recipients of benefits under government entitlement programs do not possess a substantive property right in the continuation of those benefits for purposes of the Fifth Amendment. *See Bowen v. Gilliard*, 483 U.S. 587, 604–05, 107 S.Ct. 3008, 3018–19, 97 L.Ed.2d 485 (1987); *Richardson v. Belcher*, 404 U.S. 78, 80–81, 92 S.Ct. 254, 256–57, 30 L.Ed.2d 231 (1971); *Allred v. United States*, 33 Fed.Cl. 349, 356 (1995); *see also Hoffman v. City of Warwick*, 909 F.2d 608, 616 (1st Cir.1990) ("Noncontractual employee benefits that a recipient has not yet received, but has a mere expectation of receiving, are not property as to which the government, before repealing, must provide just compensation....") (citations omitted); *Gattis v. Gravett*, 806 F.2d 778, 780 (8th Cir.1986) ("[T]he legislature which creates a statutory entitlement (or other property interest) is not precluded by having done so from altering or terminating the entitlement by subsequent legislative enactment."); *Zucker v. United States*, 758 F.2d 637, 640 (Fed.Cir.) ("[A] 'government fostered expectation' that retirees will be provided retirement annuities which will not be ravaged by inflation.... does not rise to the level of 'property' protected by the takings clause."), *cert. denied*, 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 105 (1985).

In this case the Federal Government created a benefit for plaintiffs, albeit an unintended one. Both parties admitted during argument that but for the Federal Government's levee construction, oyster growth in the area of plaintiffs' leases would not have occurred, because the area was too fresh to sustain such growth. In 1965 Congress authorized construction of freshwater diversion structures in the Breton Sound Basin in an effort to rectify the salinity problems resulting from its prior public works projects.

It could be observed that just as recipients of federal government entitlement programs have no vested right in the continuation of the benefits conferred pursuant to those programs, plaintiffs have no vested right in the benefit of continued salinity of the waters above their leased grounds. *See Allred*, 33 Fed.Cl. at 356 ("[A]ny right of the plaintiffs in the IHS health care benefits is merely procedural in nature, and does not constitute property for the purposes of the Takings Clause."). The court acknowledges that the analogy to the entitlement programs is not conclusive: In this case although the Federal Government created and withdrew the benefit of salinity, the state independently created the leasehold interests. Moreover, the analogy is not exact in that the issue in this case concerns not only whether plaintiffs have a

vested right in continued salinity, but whether plaintiffs ever acquired a compensable interest in the artificial condition of salinity.

Another line of cases that is loosely analogous deals with the relative benefits doctrine. That doctrine espouses that "if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured *in the whole*, to compensate the landowner further would be to grant him a special bounty. Such activities in substance take nothing from the landowner...." *United States v. Sponenbarger*, 308 U.S. 256, 266–67, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939) (emphasis added); *see Laughlin v. United States*, 22 Cl.Ct. 85, 111 (1990), *aff'd*, 975 F.2d 869 (Fed.Cir.1992) (Table). The relative benefits doctrine is inapplicable since it requires both an examination of the relative benefits and detriments of the Government's conduct in relation to a landowners' specific parcel and extensive factual determinations. The parties agree that facts bearing on relative benefits are contested and not ripe for adjudication. In addition, unlike most relative benefits cases, this case involves two discrete federal projects. However, although the doctrine cannot be applied, some of its underlying concepts are instructive. For example, the Court in *Sponenbarger*, stated:

> An undertaking by the Government to reduce the menace from flood damages which were inevitable but for the Government's work does not constitute the Government a taker of all lands not fully and wholly protected. When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect. *In the very nature of things the degree of flood protection to be afforded must vary* ....

308 U.S. at 265, 60 S.Ct. at 228. Implicit in the Court's pronouncement is that the degree of flooding varies over time. Similarly, the degree of salinity varies over time. Salinity is not a stable characteristic of water; instead, it is subject to the vicissitudes of nature.

With this acknowledgment that the case law is of marginal assistance, the court turns to the facts surrounding the properties at issue. *See United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958) (holding that decision of whether governmental action constitutes taking for purposes of Fifth Amendment must be based on particular facts of each case); *see also Penn Cent.*, 438 U.S. at 124, 98 S.Ct. at 2659 (ruling that Fifth Amendment takings claims are unique to individual landowner). Specifically, the court focuses on the nature of the federal government-conferred benefit and the Federal Government's recognition of the nature of that benefit for purposes of determining whether the state, and plaintiffs derivatively therefrom, acquired a property interest in the salinity of the waters above plaintiffs' leased grounds.

Defendant characterizes the benefit in this case as being "akin to ... a nuisance," which the Caernarvon project was designed to abate. Def's Br. filed Feb. 7, 1995, at 35. Although the court is not in a position to find that the salinity problem is a nuisance, defendant correctly contends that the record shows that the increased salinity resulting from the federal levee projects always had been viewed as problematic and detrimental to oyster farming.[14] Plaintiffs do not dispute this fact. The state even viewed saltwater intrusion as a menacing situation. As of the 1940s, the state, particularly concerned about the massive oyster mortality that had rendered several acres of formerly productive private lease and state seed grounds unusable, initiated various studies to identify solutions to the problem.

The Federal Government did not acknowledge affirmatively the adverse, unintended effects of its public works projects until the Fish and Wildlife Service issued the 1959 memorandum. Formal acknowledgment of

---

**14.** If the increased salinity had constituted a nuisance under state law, the situation could have been remedied by the state government at any time pursuant to state nuisance law. *See Lucas*, —— U.S. at —— – ——, 112 S.Ct. at 2899– 901. Because defendant has not sustained its burden on summary judgment of establishing a nuisance as a matter of fact and law, the court places no reliance on the nuisance doctrine.

these effects occurred in 1965, when Congress authorized the construction of freshwater diversion structures in the Breton Sound Basin.

Plaintiffs do not dispute that the areas over their leased lands were too fresh to sustain oyster growth as of 1960. Although it is unclear when those lands became fertile for oyster growth, the 1959 memorandum evidences that as of 1959 the Federal Government had recognized the adverse effects associated with its levee projects and had announced its freshwater diversion program "to re-establish natural patterns of salinity" in the Breton Sound Basin. In defining the northwest landward end of the Basin, *i.e.*, Area No. 4, as too fresh to sustain oyster growth, the 1959 memorandum stipulates that the diversion projects for that area were designed "to prevent and push back saltwater intrusion." Thus, as of 1959, the Federal Government recognized both the aberrant nature of salinity and the need to prevent saltwater intrusion in the upper landward end of the Basin; this recognition occurred prior to the time when the area could sustain oyster growth.

Even assuming that some oyster growth occurred between 1960 and 1965, when Congress formally adopted the 1959 memorandum and its recommendations, the salinity in the northwest landward end of the Basin, the area of plaintiffs' leases, lasted for, at most, five years. The fact that such area was salinated for a maximum of five years prior to the Federal Government's formal recognition of the adverse consequences associated with its prior levee projects does not enhance the position that the state acquired a vested right in that salinity level.[15]

The court holds that the state acquired no property interest in the salinity level of the waters above plaintiffs' leased grounds. Plaintiffs therefore also hold no compensable expectancy in the salinity. Accordingly, in certain limited circumstances, the Federal Government can eliminate or withdraw certain unintended benefits resulting from fed-

eral projects without rendering compensation under the Fifth Amendment. Specifically, compensation is not required in this case because the benefit conferred historically had been considered problematic and artificial, and because the Federal Government had recognized the problem and taken steps to ameliorate the situation, at the latest five years, after the occurrence of salinity in the northwest landward end of the Basin.

This result is particularly appropriate given the nature of salinity, which, like silt, is subject to the vicissitudes of nature. The Court of Claims reached a similar result in *A–B Cattle Co. v. United States*, 223 Ct.Cl. 514, 621 F.2d 1099 (1980), wherein a corporate landowner and its stockholders alleged a taking based wholly on the theory that they had a property right to silty water. The court based its holding on the state supreme court's ruling that the landowner had no property right in silty water. Given that pronouncement by the state court, the Court of Claims held: "The law of eminent domain does not allow compensation for losses of expected benefits from outside the property, not identified as property rights. An example is fish in the sea. . . . The expectation of traffic on a public street, outside retail premises, is a second example." *A–B Cattle*, 223 Ct.Cl. at 524, 621 F.2d at 1104 (citation omitted). Salinity may be construed as a benefit outside the property, like fish in the sea, and therefore compensation is not warranted.

■ Although the record does not identify the dates on which plaintiffs acquired their leasehold interests, the court rules that, notwithstanding the above analysis, any plaintiff who acquired a lease that included the provision holding the state harmless against any losses sustained as a result of freshwater diversion structures lacks a compensable property interest, because the state lease serves as an inherent limitation on that plaintiff's rights. The record indicates that between 1988 and 1990, the Louisiana Wildlife and Fisheries Commission inserted the hold-

**15.** During argument, plaintiffs proffered that the inland movement of salinity occurred gradually over about 90 years. Although plaintiffs are correct, takings jurisprudence dictates that the facts and circumstances surrounding the specific properties at issue be examined. The record reflects that prior to 1960, the areas leased by plaintiffs, as well as those leased by the 800–plus putative plaintiffs, were too fresh to sustain oyster growth.

harmless clause in all leases. Plaintiffs do not dispute this fact.

The court agrees with plaintiffs that the nature of the governmental action in this case more closely resembles a physical, as opposed to regulatory, taking, but concludes that further inquiry is unnecessary given that plaintiffs hold no compensable property interest.[16] In addition, the court rules that plaintiffs' alleged temporary takings' argument concerning the increased seasonal closures resulting from heightened levels of fecal coliform due to the Caernarvon project fails, given that plaintiffs had no compensable expectancy in the artificial condition which spawned oyster communities in the areas of plaintiffs' leases.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.

---

16. The court notes that the factual disputes identified above in the recitation of facts are not material to the disposition of this case, but are included solely to provide background. These disputes all concern issues of notice, such as whether the estimates made by defendant's experts concerning salinity ranges differed from actual estimates obtained following operation of the Caernarvon project. These disputes do not affect the ultimate issue of whether plaintiffs have a compensable property interest.

The issue of notice has caused considerable confusion in the area of takings jurisprudence. The confusion exists primarily between what constitutes a compensable property interest and what constitutes reasonable investment-backed expectations for purposes of the three-pronged inquiry relevant to regulatory takings. *See, e.g., 767 Third Ave. Assoc.,* 48 F.3d at 1582 (discussing reasonable investment-backed expectations, but concluding that "[t]he government ... *did*

*not take any property interest* of Sage. Sage *merely had an expectation of future income* from rent payments....") (emphasis added). Notice is relevant only for the latter. The former requires an analysis of whether a certain right inheres in one's title to the property.

Defendant exhibits this confusion when it cites *Ciampitti v. United States,* 22 Cl.Ct. 310, 320–22 (1991), and *767 Third Ave. Assoc.,* for the proposition that plaintiffs lacked a compensable property interest. These cases discussed only reasonable investment-backed expectations. If the reasonable investment-backed expectations prong of the three-part regulatory takings analysis were intended to involve the same analysis as the compensable expectancy inquiry, the investment-backed expectations prong would be rendered superfluous. *Cf. 767 Third Ave. Assoc.,* 48 F.3d at 1579–83; *Broughton Lumber Co. v. United States,* 30 Fed.Cl. 239, 243 (1994); *Ciampitti,* 22 Cl.Ct. at 320–22.