933 A.2d 37

DECAMP, INC., PLAINTIFF, v. NEW JERSEY TRANSIT, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided May 11, 2007.

152

*Philip R. Sellinger,* for the plaintiff (*Greenberg Traurig,* attorneys).

*Stuart Rabner,* Attorney General, for defendant (*Alvin R. Little,* Deputy Attorney General).

WINARD, J.S.C.

This action against defendant, New Jersey Transit ("NJ Transit"), arises out of the construction and development of the Montclair Connection, a recently developed rail line which transports commuters from parts of northern New Jersey directly into New York City. Plaintiff, DeCamp, Inc. ("DeCamp" or the "Company"),

is an established provider of bus services to the northern New Jersey area. DeCamp has filed this action against NJ Transit contending that NJ Transit's development and maintenance of the Montclair Connection, specifically its uniform and more economical fare structure, appropriated DeCamp's ridership and the consequential revenues.

Initially, DeCamp asserted three claims in law: 1) destructive competition; 2) inverse condemnation; and 3) negligence. This court, pursuant to NJ Transit's Motion to Dismiss for Failure to State a Claim, dismissed the destructive competition and negligence claims in 2005. After a plenary hearing on the inverse condemnation claim, the court received written summations of the trial testimony and documentary evidence. After considering the evidence presented at the plenary hearing, and the arguments of both parties, the court finds no merit to DeCamp's inverse condemnation claim, and enters judgment in favor of NJ Transit.

### Factual Background

#### A. *DeCamp and NJ Transit at the Crossroads*

DeCamp has been an established service provider in the transportation field since 1870. The Company began by providing horse-drawn buckboards, and transitioned shortly thereafter to a more traditional horse-and-buggy stagecoach. In 1907, the Company began operating motorized bus services throughout Essex County. In 1915, when the State of New Jersey began regulating bus operations, it granted operating authority to DeCamp for its existing bus routes. In the 1930s, following the opening of the Holland Tunnel, DeCamp began offering bus service to New York City from various routes in Essex County. DeCamp has operated each of these routes since the 1930s, pursuant to a certificate from the Interstate Commerce Commission ("ICC"), the federal agency previously charged with awarding operating rights to interstate bus carriers. Notwithstanding the fact that the ICC has been replaced by the U.S. Department of Transportation's Surface Transportation Board ("STB"), the certificates continue to remain

valid. Currently, a substantial portion of DeCamp's revenues are derived from providing bus services to customers on routes # 32, 33, 44, 66/66R, 88 and 99, which run from various points in northern New Jersey to midtown Manhattan. At the heart of this litigation are bus routes # 33, 66 and 88.

Routes # 33, 66 and 88 account for between seventy percent and seventy-five percent of DeCamp's commuter operating revenues. No other bus carrier has been granted certificates to operate buses on the aforementioned routes. In fact, prior to September 2002, no other bus or rail carrier could provide a "one seat ride" from Montclair, Glen Ridge or Bloomfield directly into Manhattan. However, since the opening of the rail tunnel to New York in 1910, commuters from Montclair, Glen Ridge and Bloomfield have had the option of taking a train from one of the aforementioned townships to Newark's Broad Street Station, and transferring to a train that runs directly to New York City. Hence, commuters have had, since 1910, the option of a "multi-seat ride" from Montclair, Glen Ridge or Bloomfield to New York City.

The economic operating success of DeCamp is supported in substantial part by the receipt of State subsidies provided to "distressed" bus carriers in New Jersey. These subsidies were originally provided by the Commuter Operating Agency[1] as part of the State's efforts to insure the support of private bus carriers, and sustain the needs of the State's transportation system. Subsidies to DeCamp have continued since the mid-1970s and include, *inter alia,* leases for the use of fifty buses by DeCamp in support of its interstate service.

In 1979, the New Jersey Legislature, recognizing the need for a vastly improved public transportation system, established NJ Transit. See *New Jersey Public Transportation Act of 1979,* (the "Act") *N.J.S.A.* 27:25–1 to –34. Pursuant to the Act, NJ Transit is charged with the duty to:

---

[1] The duties of the Commuter Operating Agency were transferred to New Jersey Transit by legislation in 1979. *See N.J.S.A.* 27:25–1 to –34.

plan, design, construct, equip, operate, improve and maintain either directly or by contract with any public or private entity, public transportation services.... [*N.J.S.A.* 27:25–5(h).]

To carry out its mission, NJ Transit provides bus and rail services to numerous areas of New Jersey and the surrounding Tri–States. The agency also has the authority to set fares on its bus and rail lines. In 1982, NJ Transit implemented the "Fair Fare" system, which created a uniform statewide rail fare structure. The fare a passenger is charged is dependent upon the distance the passenger travels. Fare increases and decreases are based on various factors, including reducing congestion on the highways, promoting mobility, fostering commerce, conserving limited energy resources and protecting the environment. The fares are not in harmony with the "market," and, as a result, the agency operates at a significant budget deficit. To offset this deficit, NJ Transit receives subsidies from the state and federal governments.

B. *Montclair Connection*

Beginning in 1923 and ending in 1929, the Regional Plan Association, a group of surveyors, engineers, architects, city planners and lawyers, convened and created a plan (the "Regional Plan"), which sought to improve the railroad and transportation systems in the New Jersey/New York metropolitan area. The Regional Plan proposed, *inter alia*, linking the Greenwood Lake Line with the Erie Line to improve transit between New Jersey and New York. Specifically, the Regional Plan proposed linking the Greenwood Lake Branch of the Erie Railroad at a point south of Montclair Heights, and the Newark Branch of the Erie Railroad at a point north of Athenia. The proposed linking would allow direct service from the Montclair branch into New York City. This is now known as the "Montclair Connection."

However, this portion of the Regional Plan lay dormant until the 1970s. In the 1970s, the New Jersey Department of Transportation ("NJDOT") and Montclair Township began talks about implementing the Montclair Connection. These talks led to an

agreement to redevelop the residential areas surrounding the Montclair Branch in preparation for the Montclair Connection. In 1979, NJ Transit was created and assumed responsibility for the development of the Montclair Connection.

As part of this responsibility, NJ Transit was charged with the preparation of an Environmental Impact Statement ("EIS"). The preparation of the EIS involved a public input process for determining whether the Montclair Connection, when compared to twenty-two other alternatives, would be beneficial to the Montclair area and the regional transportation network. The public input process required NJ Transit to conduct public meetings and invite parties that would be affected by the Montclair Connection. As a result, NJ Transit invited private bus carriers, including DeCamp, county planning organizations, town representatives, and transportation committees to the public hearings. The meetings were held over a three-day period from May 30 to June 1, 1984. No representative of DeCamp voiced any objections to the Montclair Connection, nor offered reasons why any of the other twenty-two alternatives being considered were better suited.

Fourteen years later, in 1998, DeCamp approached NJ Transit about the effect the Montclair Connection would have on De-Camp's business. Specifically, DeCamp broached the subject of replacing ridership that would be lost to the Montclair Connection, which still had not yet opened. DeCamp sought to provide bus services to commuters using the Allwood Park and Ride in Clifton, New Jersey. However, NJ Transit denied the proposal on the ground that it would lead to a degradation of overall service. Allison Demyanovich, Chief of Service Planning and Development for NJ Transit, testified that coordinating service between NJ Transit and DeCamp would lead to commuter confusion because commuters would need two tickets. NJ Transit also cited potential union conflicts, and scheduling issues as reasons for its refusal to allow DeCamp to provide bus services to commuters using the Allwood Park and Ride.

On September 30, 2002, NJ Transit officially launched the Montclair Connection. The line intersected DeCamp's bus routes # 33, 66 and 88 at numerous junctures. Thus, the Montclair Connection placed NJ Transit directly in competition with De-Camp for ridership in the communities surrounding the aforementioned bus routes. As a result, DeCamp claims to have lost 373,000 riders per year since 2002.

In an effort to stem the tide of lost ridership, DeCamp reopened talks with NJ Transit regarding the Allwood Park and Ride, as well as other service options. These talks proved to be fruitless. Consequently, DeCamp filed this action against NJ Transit on September 22, 2004.

### Procedural History

In its Complaint, DeCamp alleged three claims against NJ Transit. Specifically, DeCamp alleged that NJ Transit's uniform and more economical fare structure was predatory and therefore constituted, 1) destructive competition, 2) a taking by way of inverse condemnation under the United States and New Jersey Constitutions, and 3) negligence.[2]

On February 4, 2005, pursuant to a Motion to Dismiss for Failure to State a Claim filed by NJ Transit, this court dismissed the destructive competition[3] and negligence claims, but did not dismiss DeCamp's inverse condemnation claim. NJ Transit sought reconsideration of the court's decision not to dismiss the inverse condemnation claim. On March 4, 2005, this court denied NJ Transit's Motion for Reconsideration.

---

[2] DeCamp also asserted a claim for a declaratory judgment that the New Jersey Public Transportation Act, N.J.S.A. 27:25-1 to -34 was unconstitutional because it required DeCamp to litigate its destructive competition claim in an administrative forum. However, that claim was rendered moot by virtue of the court's decision to dismiss the destructive competition claim.

[3] The court, for reasons stated on the record, found no legislative intent to create a cause of action for "destructive competition," which would allow money damages to be recovered against defendant.

On August 19, 2005, NJ Transit moved for summary judgment on the inverse condemnation claim. On December 2, 2005, this court denied NJ Transit's motion.

On May 1, 2006, pursuant to a case management order, the court commenced an extensive plenary hearing, during which it considered testimony and documentary evidence to determine whether a taking by way of inverse condemnation had occurred.[4] The parties then submitted written summations of the evidence.

*Discussion* [5]

NEW JERSEY TRANSIT'S CREATION AND MAINTENANCE OF THE MONTCLAIR CONNECTION DOES NOT CONSTITUTE A TAKING

The Takings Clause of the Fifth Amendment of the United States Constitution provides that "private property shall not be taken for a public use without just compensation." *U.S. Const.* amend. V, ¶ 4. Similarly, Article One, paragraph 20 of the New Jersey State Constitution provides, "[p]rivate property shall not be taken for public use without just compensation." *N.J. Const.* art. I, ¶ 20. Because the protection from governmental takings as interpreted under Article One, paragraph 20 of the New Jersey Constitution has been held to be co-extensive with protection under the Fifth and Fourteenth Amendments of the United States Constitution, *Mansoldo v. State of New Jersey*, 187 *N.J.* 50, 58,

---

[4] In addition to hearing testimony regarding whether a taking had occurred, considerable testimony, expert and otherwise, exhibits, and documentation were presented to substantiate a methodology for the quantification of the compensable harm and the value of the controverted loss to DeCamp. DeCamp's employment of the lost profits approach conflicted sharply with NJ Transit's employment of the lost value approach, both as to the factors considered and the amount of the total loss. In view of this court having found an absence of a "taking" pursuant to the United States and the New Jersey Constitutions, it has not made any finding of fact or law pertinent to the value of DeCamp's alleged loss.

[5] Where applicable, the court makes its determination under the preponderance of the evidence standard.

898 *A*.2d 1018 (2006), an analysis of federal jurisprudence is compelling authority.

The court recognizes that the question of what constitutes a taking under the United States Constitution is a vexatious one. Justice Brennan cogently stated the dilemma in *Penn Cent. Transp. Co. v. City of New York*, 438 *U.S.* 104, 123–124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978) (internal citations omitted):

> While this Court has recognized that the "Fifth Amendment's guarantee... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances" [in that] case.

Takings cases generally fall into two categories. The first, and more easily identifiable, category of a taking is when government physically invades and appropriates private property. *Id.* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. The second category of taking occurs when government executes laws which adversely affect recognized economic interests. *Ibid.* Here, it is undisputed that no physical appropriation of any of DeCamp's property has occurred. Rather, DeCamp's argument implicates the second category of takings. Specifically, DeCamp contends that a taking has occurred because its ridership in, and consequential revenue stream from, bus routes #33, 66 and 88 has been substantially diminished by the unfair and predatory fare structure provided by NJ Transit. However, DeCamp's claim fails for two reasons: 1) DeCamp cannot show that a "protected property interest" has been harmed, and 2) New Jersey Transit's actions do not amount to a regulatory taking.

## A. *Protected Property Interest*

Central to DeCamp's argument that NJ Transit's creation and maintenance of the Montclair Connection constitutes a "taking" is

showing the existence of a protected property interest. DeCamp claims that its economic interests, specifically its ridership and the revenues derived therefrom, constitute protected property. Furthermore, DeCamp claims that it has a protected property interest because it has a de facto right of exclusivity in the aforementioned bus routes. The court finds both arguments meritless.

### 1. DeCamp's Ridership and Revenues

To constitute property, the economic interest in question cannot simply be something desired by, or even necessary to, the claimant. *Board of Regents v. Roth*, 408 *U.S.* 564, 577, 92 *S.Ct.* 2701, 2709, 33 *L.Ed.*2d 548, 561 (1972). Rather, the claimant must show that he or she has a legitimate claim of entitlement under the law to the interest, *ibid.*, or that the law recognizes his or her interest as property. *See Ruckelshaus v. Monsanto Co.*, 467 *U.S.* 986, 1003, 104 *S.Ct.* 2862, 2873, 81 *L.Ed.*2d 815, 832 (1984). It is only when the claimant can show this that the courts will "compel others to forbear from interfering with [such rights] or to compensate for their invasion." *U.S. v. Willow River Power Co.*, 324 *U.S.* 499, 502, 65 *S.Ct.* 761, 764, 89 *L.Ed.* 1101, 1107 (1945).

Here, DeCamp cannot show a legitimate claim of entitlement to its ridership and revenues therefrom, nor can it show that its ridership and consequential revenues are recognized by the law as "property." The testimony of the DeCamp witnesses acknowledges an absence of any vested or proprietary right in its ridership. Susan DeCamp testified that "ridership is not predictable and the economy has a lot to do with ridership changes." Thus, this court concludes that DeCamp has no cognizable property rights in its ridership. It follows then that there is no such right in the revenues generated from such ridership. Such revenues are not property of DeCamp until they are deposited into the proverbial "fare box." Thus, DeCamp has no cognizable proprietary interest in its ridership, and the consequential revenue stream therefrom.

DeCamp's reliance on *Eastern. Enters. v. Apfel*, 524 *U.S.* 498, 118 *S.Ct.* 2131, 141 *L.Ed.*2d 451 (1998), is misguided. In that case, a coal mining company, Eastern Enterprises, provided medical benefits for its employees pursuant to a union agreement. *Id.* at 504, 506, 118 *S.Ct.* at 2137–2138, 141 *L.Ed.*2d at 460. Many years after the company left the coal mining business, Congress enacted the Coal Act, 26 *U.S.C.* § 9701, which required coal mining companies to pay certain medical benefits. *Id.* at 514, 118 *S.Ct.* at 2141–2142, 141 *L.Ed.*2d at 465. The law was retroactive, reaching back thirty to fifty years, and required Eastern Enterprises to provide additional medical benefits to its former coal miner employees. *Id.* at 517, 118 *S.Ct.* at 2143, 141 *L.Ed.*2d at 467. Eastern Enterprises brought suit contending that the Coal Act deprived the company of its expectations and settled transactions by requiring them to provide benefits to its former employees in excess of those contemplated in the union agreement. *Ibid.* The Court agreed and held that the retroactive duty imposed by the Coal Act was a substantial form of economic regulation, destructive of vested rights, and violated basic notions of fairness underlying the Takings Clause. *Id.* at 537, 118 *S.Ct.* at 2153, 141 *L.Ed.*2d at 479.

Again, in the instant situation DeCamp is not contending earned revenues have been appropriated. Rather DeCamp's contention is that their "future" revenues are being appropriated. However, these "future" revenues are neither proprietary nor vested. They are simply expectations which may or may not be met. Thus, *Eastern Enters.* is inapposite.

2. Exclusivity of Bus Routes

Furthermore, DeCamp argues that it had an exclusive right to operate on bus routes # 33, 66 and 88. DeCamp admits that it has not been granted an explicit right of exclusivity in the routes in question. Instead, the Company argues that its longstanding and exclusive use of the three bus routes bestows upon it a de facto right of exclusivity. While a showing of such exclusivity

would constitute "protected property," *G.S. Rasmussen & Assoc., Inc. v. Kalitta Flying Serv., Inc.*, 958 *F*.2d 896, 902 (9th Cir.1992), the record is simply devoid of such a showing.

The operating certificates initially issued by the ICC do not expressly, or implicitly, provide that DeCamp's use of the bus routes in question is exclusive. Nor is there any other legislative or administrative action that lends an iota of credence to De-Camp's claim that a right of exclusivity exists in the three bus routes. In fact, just the opposite is true.

In recent years, the transportation field has increasingly drawn the attention of government, at both the federal and state levels, specifically with an eye towards improving service options to the commuting public. As stated in the Bus Regulatory Reform Act of 1982, 49 *U.S.C.A.* § 10922, the purpose of the Department of Transportation is to "prioritize the advantages of increased competitive service options to the traveling public and affected communities over the protective, competitive instincts of opposing carriers." Indeed the New Jersey Legislature envisioned a similar role for NJ Transit when it vested the agency with the authority to "plan, design, construct, equip, operate, improve and maintain either directly or by contract with any public or private entity, public transportation services...." *N.J.S.A.* 27:25–5(h).

Furthermore, the Regional Plan, which was the genesis of the Montclair Connection, has been in existence since 1929. More importantly, NJDOT and Montclair Township announced in the late 1970s that they were considering implementing the Montclair Connection. In fact, NJ Transit, as part of its preparation of an EIS, conducted public meetings over a three-day period in 1984 to determine what the impact of the Montclair Connection would be on the surrounding communities' residents and businesses. The record reflects that DeCamp, as well as other bus carriers, was invited to this meeting. Thus, DeCamp knew, or should have known, about the pending creation and development of the Montclair Connection as far back as 1984. Yet, the Company failed, for fourteen years, to voice any objection to the Montclair Connec-

tion's operation over its "exclusive" terrain, or the rail's encroachment upon its "protected property."

In light of the above, it is incredible for DeCamp to believe that it holds a right of exclusivity in its bus routes. There is simply no evidence to support the notion that a competing carrier or a public agency has been precluded from creating its own service options. The alleged proprietary interests of DeCamp in its bus routes at all times remained subordinate to potential competition in the public interest. Thus, the State was not foreclosed from creating the Montclair Connection by virtue of certificates granted to DeCamp, even if those certificates have been granted to DeCamp for over seventy-five years.

## B. *Inverse Condemnation*

Assuming arguendo that this court were to find that some protected property interest was implicated by the creation of the Montclair Connection, DeCamp's claim that a regulatory taking has occurred still fails. A regulatory taking occurs when government regulation goes too far. *Pennsylvania Coal Co. v. Mahon*, 260 *U.S.* 393, 415, 43 *S.Ct.* 158, 160, 67 *L.Ed.* 322, 326 (1922). To determine whether a certain regulation "goes too far," courts examine three factors: 1) the economic impact of the regulation on the claimant; 2) the character of the government action; and 3) the extent to which the regulation interferes with investment-backed expectations.[6] *Penn Cent. Transp. Co., supra,* 438 *U.S.* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. Here, DeCamp has come forward with significant evidence that the establishment of the Montclair Connection has severely diminished its business. Therefore, the first factor under the *Penn Central* test is deemed satisfied. However, the final two factors clearly weigh against

---

[6] It is undisputed that DeCamp still retains economically viable use of its business assets. Therefore, the court evaluates its inverse condemnation claim under the regulatory taking rubric set forth in *Penn Cent. Transp. Co., supra. See Lingle v. Chevron U.S.A., Inc.,* 544 *U.S.* 528, 538, 125 *S.Ct.* 2074, 2081, 161 *L.Ed.*2d 876, 887–88 (2005).

DeCamp and thus, defeat its argument that a regulatory taking has occurred.

### 1. The Character of the Governmental Action

██  Not every governmental regulation or action that interferes with a party's economic interests constitutes a taking. For example, in *Penn Cent. Transp. Co., supra,* 438 *U.S.* at 115–116, 98 *S.Ct.* at 2655, 57 *L.Ed.*2d at 643–644, a Landmarks Preservation Commission, acting pursuant to New York City's Landmarks Preservation Law, designated Grand Central Terminal as a landmark, and disapproved a plan for the construction of a multi-level office building in the space over the terminal. Penn Central, the plaintiff, brought suit against the City of New York on the grounds that the designation of Penn Central terminal as a landmark deprived them of their air rights over the property. *Id.* at 118–119, 98 *S.Ct.* at 2656, 57 *L.Ed.*2d at 645. The Court held that a governmental restriction on the use of air rights above the property did not constitute a "taking," notwithstanding a perceived investment-backed expectation in the use of the air rights over the property. *Id.* at 136–137, 98 *S.Ct.* at 2665–2666, 57 *L.Ed.*2d at 656. The Court reasoned that just because government action has a "more severe impact on some landowners than on others," that in itself does not render the government action to be a "taking." *Id.* at 133, 98 *S.Ct.* at 2664, 57 *L.Ed.*2d at 654. The Court found significant that Penn Central's primary use of the facility as a "railroad terminal containing office space and concessions" remained unfettered. *Id.* at 136, 98 *S.Ct.* at 2665, 57 *L.Ed.*2d at 656.

Even in cases where a private company holds a franchise that precludes competition by other private companies, the government may still engage in direct competition with the franchise holding company. For example, in *United Railroads of San Francisco v. City & County of San Francisco,* 249 *U.S.* 517, 519, 39 *S.Ct.* 361, 362, 63 *L.Ed.* 739, 746 (1919), the municipality granted a franchise to a privately operated railroad company. Some years later, the

■■■■■■■■■■■■■■■■■

municipality sought to lay down tracks for a municipal street railway on both sides of plaintiff's railroad tracks. *Id.* at 518, 39 *S.Ct.* at 362, 63 *L.Ed.* at 746. An action was brought to enjoin such construction. *Ibid.* The plaintiff argued that by virtue of granting the franchise to the plaintiff, the proposed municipal action was precluded, and to allow such action would constitute a taking without just compensation. *Id.* at 519, 39 *S.Ct.* at 362, 63 *L.Ed.* at 746. The Court rejected the argument, and reasoned that the grant of the franchise did not prevent the city from establishing a parallel road:

> a covenant by a city not to grant to any other person or corporation a privilege similar to that granted to the covenantee does not restrict the city from itself exercising similar power... The city now is given the power to establish and operate [a] transportation service... so far as the harm to the plaintiff is an inevitable consequence of the city's doing what the plaintiff's franchise did not make it unlawful for the city to do, the infliction of that harm is not a taking of the plaintiff's property that requires a resort to eminent domain. (Internal citations omitted).

*Id.* at 520–521, 39 *S.Ct.* at 362–363, 63 *L.Ed.* at 747; *see also Helena Water Works v. City of Helena*, 195 *U.S.* 383, 25 *S.Ct.* 40, 49 *L.Ed.* 245 (1904) (rejecting claim that a taking occurred when a city government endeavored to create its own water system despite the fact a private water service company, which held a franchise, was rendered less profitable).

■■■■ Here, DeCamp's regulatory taking claim mischaracterizes the development and maintenance of the Montclair Connection as regulation. DeCamp stresses NJ Transit's uniform and lower fares, which they allege is the product of NJ Transit's ability to operate at a significant budget deficit due to the government subsidies it receives, and NJ Transit's refusal to allow DeCamp to expand its service to the Allwood Park and Ride as evidence of regulation which appropriates DeCamp's business.[7]

---

[7] It bears restating at this point that there is no demonstration of the taking of DeCamp's physical property, or any imposed restriction on its operations on the affected bus routes.

However, the uniform and more economical fare structure provided by NJ Transit does not constitute a regulatory taking, but simply a form of competition. As a practical matter, the choices of the commuter are dependent on economics, comfort level of service, points of origin and destination, and the efficiency of the provided transportation service. Riders accustomed to the De-Camp bus service into Manhattan may continue to choose their traditional means of commuting. Nothing that NJ Transit has done forecloses that option. However, other riders may decide to take advantage of the technology, speed and economic efficiency provided by the Montclair Connection. That is the commuter's decision. DeCamp's bottom line may suffer great harm by virtue of such a decision, but it is by virtue of the commuter's decision, and not the actions of NJ Transit, that such harm befalls DeCamp. In sum, NJ Transit has not "taken" DeCamp's services by virtue of its fare structure, but simply made such services less desirable. That does not constitute a regulatory taking. Thus, there is no rational basis to suggest that NJ Transit's fare structure constitutes regulation of DeCamp's business.

█ Furthermore, DeCamp's argument that NJ Transit's fare pricing constitutes regulation because it is "deliberately below-market" must also fail. The testimony and documentary evidence establish that there is no basis in fact to suggest that NJ Transit's fare pricing is predatory, or "deliberately below-market," and intended to put private bus carriers out of business. As established by NJ Transit witness testimony, NJ Transit's implementation of a uniform and more economical fare structure was simply to foster fare predictability among all rail commuters, and to implement a cross-honoring system between rail lines. Such fare predictability and cross-honoring is intended to encourage use of the entire public transportation system, not put private carriers out of business.

Also, while it is true that the State of New Jersey has provided NJ Transit with subsidies to make up its operating losses and keep fares low since the 1970s, it is equally true that during this

same time the State has provided private bus carriers, including DeCamp, with financial assistance to improve and maintain their operations. DeCamp receives substantial assistance through the NJ Transit Bus Allocation Program and the Private Carrier Capital Improvement Program, including the use of fifty buses for its operations. DeCamp's operating success is largely dependent upon these subsidies. Thus, there is no logical or principled basis to argue that the State is "deliberately" attempting to destroy DeCamp's business.

■ Finally, the refusal of NJ Transit to allow DeCamp to provide bus services to commuters using the Allwood Park and Ride cannot be deemed to constitute an arbitrary regulation of DeCamp's business. The testimony established that allowing DeCamp to provide bus services to commuters using the Allwood Park and Ride would result in a degradation of overall service. Furthermore, scheduling issues and potential union problems were identified as the justification for denying DeCamp's request to run coordinated service in Allwood. In this respect, there is no evidence of bad faith, nor arbitrariness, nor any cognizable evidence of a motive to target DeCamp to shoulder the burden which implicates "fundamental principles of fairness underlying the Takings Clause." *Eastern Enters., supra,* 524 *U.S.* at 537, 118 *S.Ct.* at 2153, 141 *L.Ed.*2d at 479. Thus, in the absence of some duty, NJ Transit's refusal to mitigate a loss, or provide an acceptable alternative, does not impeach the character of its actions, which are consistent with the purpose of its enabling legislation to maintain a transportation system compatible with the needs of the commuting public in the most efficient and economical manner.

2. The Regulation's Interference With the Reasonable Investment–Backed Expectations of the Claimant

■ The third and final factor of the *Penn Central* test requires the court to examine the "regulation's" interference with the reasonable investment-backed expectations of the claimant. Again, the court reiterates that NJ Transit's actions do not

constitute regulation. However, even if the court were to assume arguendo that a regulation occurred, DeCamp cannot show any reasonable investment-backed expectations. DeCamp cannot show that it reasonably expected its ridership and revenues to continue to accrue free from all competition, either from public or private companies. The agreement between the NJDOT and Montclair Township to create the Montclair Connection was made public in the late 1970s, and public meetings were conducted to receive input from residents and businesses, including DeCamp. Finally, since the inception of its interstate bus business in the 1930s, DeCamp has been competing with rail lines which provide multi-seat rides from Montclair, Glen Ridge and Bloomfield to New York City. These facts categorically strike at the heart of DeCamp's argument that it reasonably expected to provide bus services over the aforementioned routes, free from competition by a private carrier or a public carrier, ad infinitum. In light of the above, a "taking" argument, albeit characterized as a regulatory taking, lacks any rational basis.

### C. *Policy Considerations*

The court pauses to note that if NJ Transit is found to have constitutionally "taken" the property of DeCamp in this case, it would unleash an avalanche of litigation by private transportation companies which cannot compete with the more economically efficient and convenient public transportation systems. If this court were to find that DeCamp has a "property" interest in its "future" revenues or its bus routes, and that the State's development of a transit system which diminishes the value of that property, constitutes a taking, then a considerable legislative investment in major, innovative transportation rail projects may be impossible. Such projects, planned in furtherance of a legislative mandate for an improved regional rail transportation system, would be frustrated or rendered economically prohibitive. Neither the U.S. Constitution, nor the New Jersey Constitution, countenances such a result.

## Conclusion

For the foregoing reasons, the court finds that no compensable taking has occurred, and enters judgment in favor of NJ Transit.